Robert W. NEGRICH, Plaintiff,

v.

William R. HOHN, Warden, Westmoreland County Prison, Marshall V. Benjdich, Asst. County Detective, Edward F. Singer, Pennsylvania State Police, Defendants.

Civ. A. No. 65-517.

United States District Court
W. D. Pennsylvania.

Oct. 7, 1965.

Harry Alan Sherman, Pittsburgh, Pa., for plaintiff.

T. J. Reinstadtler, Pittsburgh, Pa., for State Police.

H. Reginald Belden, Greensburg, Pa., Gilbert J. Helwig, Pittsburgh, Pa., for other defendants.

DUMBAULD, District Judge.

Plaintiff, Robert W. Negrich, now an inmate of the Pennsylvania State Correctional Institution at Huntingdon, was confined at the Westmoreland County Prison on November 9, 1963, awaiting trial on a charge of armed robbery. A prison breach took place on that date. Five other prisoners escaped, but were caught. They implicated Negrich. He now contends that he acquiesced in the planned escape through fear, as otherwise the other prisoners would have hit him in the head and locked him up in a cell; but in any event his own statements show his guilt of participation in the prison breach, in the course of which a guard, John Marefka, was injured. The inmate's statements also show that he altered medical charts and obtained and used quantities of drugs or pills in violation of prison regulations.

Negrich was indicted in Westmoreland County for aiding prison breach at No. 200 January Term 1964 and, with the other five participants, at No. 204 January Term 1964, for assault and battery, aggravated assault and battery, and assault and battery with intent to kill. All defendants pleaded not guilty and went to trial on March 9, 1964. At this trial Negrich was represented by counsel, his own attorney who procured his acquittal in the armed robbery charge, and was appointed by the Court to defend him in the charges arising out of the prison breach.

After four days of trial at which the Commonwealth's case was presented, Negrich and the other defendants changed their pleas from not guilty to guilty. Negrich was given two years' suspended sentence on the aiding prison breach charge, and $2\frac{1}{2}$ to 5 years on the assault counts. (The sentence could have been 2 years on the first count, three years at labor or solitary confinement on the second, and seven years solitary confinement at labor on the third. 18 P.S. §§ 4708, 4709, 4710.)

On May 11, 1965, Negrich filed in this Court a lengthy hand-written complaint on pink and yellow paper. The complaint cited the Eighth Amendment, the Fourteenth Amendment, 42 U.S.C. §§ 1983–1986, as well as 28 U.S.C. §§ 1331 and 1343. Named as defendants were the sentencing Judge, the Honorable Earl S. Keim, the District Attorney, Richard E. McCormick (who did not actually participate personally in the inmate's trial), Sheriff Alex W. Copeland, Prison Guard John Marefka, Assistant County Detective Marshall W. Benjdich [should be spelled Brajdich], and State Trooper Edward F. Singer. The first four above-named parties were eliminated by orders of this Court dated May 18, 1965, and September 21, 1965. The Court appoint-

ed to represent the plaintiff *in forma pauperis*, as a public service without any avenue of remuneration, Harry Alan Sherman, Esq., who had recently been successful in a case under the legislation involved here, Basista v. Weir, 340 F.2d 74 (C.A.3, 1965). Other able members of the bar of this Court have appeared for the defendants, and the interests of all parties were capably represented at the argument on defendants' motion to dismiss.

The issue, as limited at the argument, is whether plaintiff states a case under the civil remedy provisions [1] of section 1 of the Act of April 20, 1871, 17 Stat. 13, commonly known as the "Third Force Bill" or the "Ku Klux Act", as carried forward in 42 U.S.C. § 1983, which provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The legislative history of the section is discussed at length in the opinions in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and in Horace Flack, The Adoption of the Fourteenth Amendment (1908) 227–49. See also Screws v. United States, 325 U.S. 91, 99–100, 65 S.Ct. 1031, 89 L.Ed. 1495

(1945); Hague v. C. I. O., 307 U.S. 496, 509–510, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); and Claude G. Bowers, The Tragic Era (1929) 340–48.

Counsel was correct in thus limiting the issues, and treating the other portions of plaintiff's original paper writing as surplusage. No issue involving the Eighth Amendment (which provides that "cruel and unusual punishments" shall not be "inflicted") is raised. That provision was directed against the English experiences that loomed large in the minds of the framers of our government, such as branding, mutilation, and cutting off the ears in Star Chamber. 3 How. State Trials 561, 711, 725. Disembowelment, being drawn and quartered, and all the gory incidents of the punishment for treason in England were banned. Torture, boiling in oil, and other unnecessary forms of cruelty are forbidden. Wilkerson v. Utah, 99 U.S. 130, 135–136, 25 L.Ed. 345 (1879); Weems v. United States, 217 U.S. 349, 368–373, 30 S.Ct. 544, 54 L.Ed. 793 (1910). It is arguable that in some circumstances a common or usual form of punishment may be forbidden because it is disproportionate to the offense (217 U.S. at 368, 30 S.Ct. at 549) or imposed for a physical disease which is not a crime. Robinson v. State of California, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). See also dissent of Mr. Justice Goldberg to denial of certiorari in Rudolph v. Alabama, 375 U.S. 889–891, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963). Conceivably, it may sometime be held that capital punishment of persons whose crimes were the product of mental disease is cruel and unusual

---

[1]. A similar provision establishing criminal penalties was contained in section 17 of the Act of May 31, 1870, 16 Stat. 140, derived from the Civil Rights Act of April 9, 1866, 14 Stat. 27, and carried forward in 18 U.S.C. § 242, which provides: "Whoever, under color of any law, statute, ordinance regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to dif-

ferent punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both." For the legislative history of this section see United States v. Williams, 341 U.S. 70, 73, 75, 83, 89, 71 S.Ct. 581, 95 L.Ed. 758 (1951); and Screws v. United States, 325 U.S. 91, 98–100, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

punishment. Cf. United States v. Currens, 290 F.2d 751 (C.A. 3, 1961).

■ But to be cruel and unusual punishment it is first necessary that the hardship suffered be "punishment". Thus deportation, though it may deprive a worthy individual of much that he holds dear, is not punishment. Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954). So too, under the accepted philosophy of Juvenile Court statutes, the treatment accorded to juveniles for their rehabilitation does not constitute punishment, even if it includes confinement in an institutional setting. Holmes' Appeal, 379 Pa. 599, 605, 109 A.2d 523 (1954). The same rule applies to confinement in a mental institution.

■ Not every physical hardship or restraint suffered in the course of governmental activity is to be regarded as punishment. Otherwise much military training in the armed services, and even the space program, would be proscribed. Punishment is a penalty inflicted by a judicial tribunal in accordance with law in retribution for criminal conduct. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 164–167, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); cf. United States v. Brown, 381 U.S. 437, 456–457, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).

Similarly it is correct that 42 U.S.C. §§ 1975 and 1986, relating to conspiracy, are inapplicable here.

We turn therefore to 42 U.S.C. § 1983 as the *sedes materiae* for our inquiry.

This section first requires that the abuses complained of be committed under "color" of State authority. Here we think plaintiff must be held to have made out his case. Whatever merits the views of the late Mr. Justice Frankfurter in Monroe v. Pape, 365 U.S. 167, 212–223, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), may have as a matter of historical scholarship, as to which we venture no opinion, not having had the opportunity to engage in the necessary research or to master the pertinent materials relating to the legislative history of the statutes involved, we are bound by the majority's contrary view. This is particularly so when Mr. Justice Frankfurter admits having himself formerly acquiesced in the view later recanted [2] (ibid., 218, 81 S.Ct. 501) and when Mr. Justice Harlan [3] was with the majority (ibid., 192, 81 S.Ct. 486).

The section next requires that "deprivation" of rights, privileges, or immunities "secured by the Constitution and laws" be established. We do not pause to consider whether "deprivation" requires conduct more affirmative in its character than would "denial" of rights under the equal protection clause. See Monroe v. Pape, 365 U.S. 167, 256–257, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). We shall treat any violation as a deprivation. Likewise we do not pause to consider whether rights "secured" by federal constitutional or statutory enactments are of a more limited scope than rights "conferred", "granted", or "created" by such provisions.[4] We accept also the position that the term "laws" includes doctrines enunciated in judicial decisions.[5]

2. Compare the equally graceful confession of prior error by Mr. Justice Jackson in McGrath v. Kristensen, 340 U.S. 162, 177–178, 71 S.Ct. 224, 95 L.Ed. 173 (1950).

3. Mr. Justice Harlan is foremost among those who repudiate what critics of the Supreme Court call "manufactured history". See his dissent in Wesberry v. Sanders, 376 U.S. 1, 30–42, 84 S.Ct. 526, 11 L.Ed.2d 481 (1962); Reynolds v. Sims, 377 U.S. 533, 594–615, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Carrington v. Rash, 380 U.S. 89, 97, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Griswold v. State of Connecticut, 381 U.S. 479, 500–501, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The phrase "manufactured history" appears in Anthony Lewis, "A Tough Lawyer Goes to the Court", New York Times Magazine (August 8, 1965) 11.

4. See Logan v. United States, 144 U.S. 263, 289, 12 S.Ct. 617, 36 L.Ed. 429 (1892); Hague v. C.I.O., 307 U.S. 496, 512, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); United States v. Williams, 341 U.S. 70, 78, 71 S.Ct. 581, 95 L.Ed. 758 (1951).

5. See cases cited in Dumbauld, The Constitution of the United States (1964) 313.

We take note in passing of the fact that under the corresponding criminal provisions in 18 U.S.C. § 242 proof of specific intent to deprive of such rights is required. This requirement was read into the law by the Supreme Court in Screws v. United States, 325 U.S. 91, 101, 104–105, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), in order to avoid the result that otherwise the statute would be "void for vagueness" since it would require defendants to anticipate the content of *future* Supreme Court decisions on questions of constitutional law. Cf. Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232 (1913); and Cramp v. Bd. of Public Instruction, 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961). But in civil cases the requirement that specific intent be proved does not apply. Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473 (1961). Mr. Justice Frankfurter agreed with that conclusion. Ibid., 206–207, 81 S.Ct. 494–495.

What, then, are the rights to deprivation of which plaintiff claims to have been subjected by the three law enforcement officers who remain as defendants in the case?

█ We lay aside the allegations which relate to the plaintiff's confinement in a cell by himself and his restricted diet and privileges. These are matters involving prison discipline. They are, moreover, amply justified as precautionary measures to be taken after the inmate's participation in a jail break. Such issues do not present any questions as to constitutional rights subject to judicial supervision. Peretz v. Humphrey, 86 F.Supp. 706, 707 (M.D.Pa. 1949); Sweeney v. Woodall, 344 U.S. 86, 90, 73 S.Ct. 139, 97 L.Ed. 114 (1952); Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948); Stroud v. Swope, 187 F.2d 850, 851–852 (C.A.9, 1951), cert. den. 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627; United States ex rel. Wagner v. Ragen, 213 F.2d 294, 295

(C.A.7, 1954), cert. den. 348 U.S. 846, 75 S.Ct. 68, 99 L.Ed. 667. Even if such measures had as one of their purposes the securing of a confession they would still be merely matters of prison discipline and justifiable as such.

The crux of plaintiff's case lies in the allegations that the warden, the assistant county detective, and the State trooper secured a confession of plaintiff's participation in the prison breach by pushing, hitting, and slapping him.

█ It is plain that a conviction obtained by the use of a coerced confession could not stand. Jackson v. Denno, 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed. 2d 908 (1964).

However, plaintiff's conviction was not secured by use of such a confession. The element of causal connection is lacking. Plaintiff's allegedly coerced confession was never used against him. The poisonous tree bore no fruit. Plaintiff and his codefendants at the trial listened to the Commonwealth's independent evidence *aliunde* and concluded that the "jig was up", and that it was the part of prudence to change their plea rather than try to put in a defense.[6]

By a curious coincidence, on the day of the argument in this case the next matter to come before the Court was a defendant for sentence who had resorted to the same maneuver in a trial before this Court and a jury. After hearing the government's case, the defendant preferred to change his plea rather than face the consequences of a jury verdict.

█ Plaintiff rightly points out that where there is a deprivation of a federal right under 42 U.S.C. § 1983 the outcome of the prosecution against the person whose rights are violated is immaterial. The existence of a State remedy for the evil complained of is of no significance. See Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed. 2d 492 (1961).

In Monroe v. Pape, as in Basista v. Weir, 340 F.2d 74 (C.A.3, 1965) there

---

6. Of course the situation would be different in a case where a plea of guilty is induced in advance of trial by reason of the existence of an irregularly procured confession.

was a violation of the Fourth Amendment, by reason of illegal search and seizure. Police officers wilfully invaded complainants' homes without justification. Such violation *per se* created liability under 42 U.S.C. § 1983 regardless of the outcome of any State prosecution.

■ But where a pure due process question is presented (that is, where there is no violation of any provision in some other Amendment which is "incorporated" or "absorbed" or "assimilated" by the Fourteenth) then the mere occurrence of improper conduct does not create liability under 42 U.S.C. § 1983 until it produces consequences which amount to a violation of the Fourteenth Amendment itself by adversely affecting the due administration of justice. In the case at bar no such consequences were produced.

■ Here, unlike the Fourth Amendment cases, until some improper use was made of the allegedly coerced confession, there would be no violation of the federal Constitution or laws, and hence 42 U.S.C. § 1983 would not come into play.

Mere assault and battery (whether or not there is a State remedy) is not *per se* a federal case under 42 U.S.C. § 1983. Screws v. United States, 325 U.S. 91, 108, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

Otherwise, every child's complaint concerning the severity of chastisement received at home or in school would amount to a controversy of constitutional dimension. Surely it suffices that under current doctrine the federal judiciary has usurped the fundamental sovereign political powers [7] of the people over the structure of their State government,[8] without also undertaking to exercise supervision over the administration of domestic discipline in the household and schoolroom.

Having had occasion to read, since the argument, one of Professor Arthur John Keeffe's stimulating columns in the American Bar Association Journal,[9] I think it proper to mention for the sake of completeness an idea which comes to mind as a result of Professor Keeffe's comments on Griswold v. State of Connecticut, 381 U.S. 479, 484–485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). That amusing case upheld the apparently God-given natural right of married [10] people to use contraceptives. The majority opinion bases its conclusion on "penumbral" [11] radiations from various provisions of the Bill of Rights. Stress was laid on "freedom of association" as a "peripheral" First Amendment right (p. 483, 85 S.Ct. p. 1681) and on the repulsiveness under Fourth Amendment philosophy of a police

7. James Madison regarded provisions concerning representation as fundamental matters, requiring regulation at the constitutional level by the people rather than by the ordinary legislature. Dumbauld, The Constitution of the United States (1964) 93. In the familiar words of John Locke: "When any one, or more, shall take upon them to make laws whom the people have not appointed so to do, they make laws without authority, which the people are not therefore bound to obey." Legislation not enacted in the manner prescribed by the people would lack "that which is absolutely necessary to its being a law, the consent of the society." Ibid., 15–17.

8. Drew v. Scranton, 229 F.Supp. 310, 316 (M.D.Pa.1964). In Pennsylvania the State Supreme Court has tried to beat the federal tribunal to the punch in exercising these high political functions. Butcher v. Bloom, 415 Pa. 438, 443–444, 203 A.2d 556 (1965).

9. Vol. 51, No. 9 (September, 1965) 885–86.

10. *A fortiori* unmarried people will have to be accorded the same right, in future pronouncements, if social convenience be the criterion of constitutionality. For if it is desirable that married people not have children, it is surely more desirable that unmarried people not have them. But perhaps in the sight of "the Laws of Nature and of Nature's God" there is no distinction between legitimacy and bastardy. Legitimacy is perhaps just a "status symbol" devised by human contrivance. At any rate social welfare workers today condemn viewing illegitimacy in a "judgmental" manner.

11. "Penumbral" means "almost shadowy". Perhaps a better adverb when speaking of the Supreme Court's doctrine of penumbral radiation would be "altogether."

search in the "sacred precincts" of the bedroom for "telltale signs" of use of contraceptives (p. 485, 85 S.Ct. p. 1682).

As Mr. Justice Stewart aptly observes (pp. 527–528, 85 S.Ct. p. 1705):

"In the course of its opinion the Court refers to no less than six Amendments to the Constitution: the First, the Third, the Fourth, the Fifth, the Ninth, and the Fourteenth. But the Court does not say which of these Amendments, if any, it thinks is infringed by this Connecticut law."

Perhaps the best characterization of the case is contained in a quotation from a law review article in a footnote (at p. 518, 85 S.Ct. at p. 1700): "The law is unconstitutional—but why?"

Professor Keeffe treats the decision as establishing a right of privacy [12]—the right to be free from unjustified intrusion by government. "The Court seems to have found a way to protect natural law rights without bringing back substantive due process." [13]

On the basis of Professor Keeffe's analysis of Griswold, therefore, it might be argued that Negrich has a Ninth Amendment right to privacy, to be free from unjustified intrusion by government. Upon the basis of this hypothesis it might be concluded that such a federal right has been violated, and that 42 U.S.C. § 1983 would come into play. But it would be unseemly for a court of first instance, absent further illumination by lightnings from Olympus, to base its decisions upon so "penumbral" or nebulous a doctrine. National Fruit Product Co. v. Dwinell-Wright Co., 47 F.Supp. 499, 507 (D.Mass.1942); United States v. South-Eastern Underwriters Assn., 51 F.Supp. 712, 715 (N.D.Ga.1943); Charles E. Wyzanski, Jr., Whereas—A Judge's Premises (1965) 22. Cf. Barnette v. W. Va. State Bd. of Education, 47 F.Supp. 251, 252–253 (S.D.W.Va.1942).

A word should also be said, in view of the reinvigoration of natural law doctrines, on the question whether prison breach constitutes conduct which may constitutionally be made a crime. Cf. Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). We are mindful that Thomas Jefferson omitted that offense from his Bill for Proportioning Crimes and Punishments in Cases Heretofore Capital, when revising Virginia law after the Revolution, on the ground that: "It is not only vain, but wicked, in a legislator to frame laws in opposition to the laws of nature, and to arm them with the terror of death. This is truly creating crimes in order to punish them. The law of nature impels every one to escape from confinement; it should not therefore be subjected to punishment. Let the legislator restrain his criminal by walls, not by parchment." 2 Boyd, Papers of Thomas Jefferson (1950) 502. However, danger to the life of prison guards and the public in connection with escapes doubtless justifies imposition of criminal sanctions.

In conclusion, it may be appropriate to echo the wish of that zealous champion of civil liberties, Professor Zechariah Chafee, Jr., that Congress would enact well-drafted, clear and precise statutes on the subject of civil rights, specifically addressed to modern needs and aspirations. Where federal protection is de-

---

12. The right of privacy was first urged in the famous article by Brandeis and Warren in 4 Harvard Law Review 193 (1890). Mr. Justice Brandeis in his stirring dissent in Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) declares that "The makers of our Constitution * * * conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."

13. 51 A.B.A.J. at 886. Of course the decision *does* bring back "substantive due process", as Mr. Justice Black points out (381 U.S. at 515–516, 85 S.Ct. at 1698–1699). Perhaps the ultimate irony in Griswold is the fact that it is a Jew who accepts most overtly the Roman Catholic doctrine of natural law (see opinion of Mr. Justice Goldberg on the Ninth Amendment, 381 U.S. at 487–493, 85 S.Ct. at 1683–1687), and that the doctrine is relied upon to justify a sex practice upon which that faith frowns.

sirable, "we ought to get it by something better than a * * * statute of antiquated uncertainties * * * It is very queer to try to protect human rights in the middle of the Twentieth Century by a left-over from the days of General Grant." Chafee, "Safeguarding Fundamental Human Rights: The Tasks of States and Nation," 27 Geo.Wash.L.R. 519, 529 (1959), quoted in 365 U.S. at 244, 81 S.Ct. at 515. See also United States v. Williams, 341 U.S. 70, 74, 71 S.Ct. 581, 95 L.Ed. 758 (1951); and Picking v. Pennsylvania R. R. Co., 151 F.2d 240, 249 (C.C.A.3, 1945) where Judge Biggs said: "The concept is clear enough but the boundaries of the forbidden territory are ill-defined."

The legislation involved here is a remnant of the unedifying and unsavory Reconstruction period which Claude Bowers has aptly called "The Tragic Era". Collins v. Hardyman, 341 U.S. 651, 657, 71 S.Ct. 937, 95 L.Ed. 1253 (1951). For the purpose of maintaining the dominance of the Republican Party in the councils of the nation,[14] many measures were adopted by the Radicals in Congress which were out of keeping with American traditions. Basically, there were three fundamental incongruities: (1) the federal government was exercising powers which properly belong to local government units, thus violating the accepted principles of American federalism; (2) the agency of the federal government which was in command was the army,[15] violating the distinctive American principle of the supremacy of the civil over the military branch of the government; (3) the States were deprived of their normal relationship to the Union. Instead of "an indissoluble Union, composed of indestructible States",[16] theories of "forfeited rights", "State suicide", "conquered provinces", and other anomalous concepts foreign to orthodox American political philosophy were rampant.[17]

Much that was done then may be described as "the work of military violence cloaked in the merest tatters of legality."[18] To prevent the possibility of judicial scrutiny of the constitutionality of Reconstruction legislation, Congress even curtailed the jurisdiction of the Supreme Court in a pending case.[19]

In this connection it may be noted that even the Fourteenth Amendment itself, the hat from which the Supreme Court has drawn so many constitutional rabbits, is of dubious origin. Necessary for its ratification were the votes of conquered States which were not permitted representation in Congress.

In other words, those States were recognized and treated as States, under the dominant Radical theory, for the purpose of exercising the supreme legislative function of enacting an Amendment which would become "Part of this Constitution" (and hence "the supreme Law of the Land".) But at the same time they were not recognized and treated as

14. Joseph B. James, The Framing of the Fourteenth Amendment (1956) 20.

15. There was even military control of religion. Perhaps the most striking instance was the order of Maj. Gen. Charles R. Woods of September 20, 1865, prohibiting all the Episcopal clergy in Alabama from exercising their ecclesiastical functions. This was soon rescinded after criticism in the North. Walter L. Fleming, Documentary History of Reconstruction (1906), II, 216, 221–25.

16. State of Texas v. White, 7 Wall. 700, 725, 19 L.Ed. 227 (1868).

17. Fleming, Documentary History of Reconstruction (1906), I, 106, 124–26, 144–49.

18. These words are used by a noted English historian to characterize the execution of King Charles I. Samuel R. Gardiner, History of the Commonwealth and Protectorate (2nd ed. 1897), I, 1.

19. Act of March 27, 1868, 15 Stat. 44. The Supreme Court acquiesced in Ex parte McCardle, 7 Wall. 506, 514, 19 L.Ed. 264 (1869). Mr. Justice Robert C. Grier, of Pennsylvania, strongly protested against a continuance of the case until Congress could pass the legislation. Mr. Justice Stephen J. Field, of California, also opposed continuance. Dumbauld, "Pennsylvania's Contributions to the Law", in Pennsylvania's Contributions to the Professions (edited by Homer T. Rosenberger, 1964) 9, 14.

States for the purpose of participating in the less exalted legislative function of enacting ordinary laws in Congress.

It was also necessary, in order to obtain the requisite number of ratifications, to count the votes of two States (Ohio and New Jersey) which had retracted their ratifications.[20]

Long-continued popular acquiescence, the omnific panacea in a nation accepting the political philosophy that all just government derives its powers from the consent of the governed, has by now resolved any lingering doubts and established beyond attack the legal validity of the Fourteenth Amendment. Dumbauld, The Constitution of the United States (1964) 436.

One of the purposes of the framers of the Fourteenth Amendment was to put beyond question the constitutionality of the first Civil Rights Act of April 9, 1866, 14 Stat. 27. Some of its supporters had justified that act as a measure for enforcement of the Thirteenth Amendment, which eliminated slavery.[21]

Slavery and its *sequelae* are now so obsolete that it is hard for us today to imagine the legal situation of a victim of that "peculiar institution". But it is a well-established historical fact that during the existence of slavery in the United States, the law regarded the slave as a chattel, as mere property, rather than as a legal person. Griswold, Law and Lawyers in the United States (1964) 106. Hence a slave could not testify, own property, make contracts, get married, or enter into any of the normal legal transactions of everyday life. Did the mere abolition of slavery, the destruction of the slave-owner's property right in another human being, confer upon the former slave these ordinary incidents of legal personality? Did it make him a citizen? The answer was not free from doubt. It will be remembered that under Dred Scott v. Sandford, 19 How. 393, 405–407, 576–578, 15 L.Ed. 691 (1857), slaves were not citizens. Since national citizenship was derivative, depending upon State citizenship, and since slavery (like infancy, insanity, coverture, and the like) was a matter of personal status dependent on State law,[22] the legal position of slaves freed by the Thirteenth Amendment was far from clear until the Fourteenth Amendment went into force. The Civil Rights Act of 1866 undertook to clarify their status and to confer upon them the normal incidents of legal personality and the capacity to enter into the usual legal transactions of everyday life.

Subsequently, after the Fourteenth and Fifteenth Amendments had gone into force, Congress passed the Act of May 31, 1870, to enforce the right to vote. 16 Stat. 140. As a measure of precaution, section 18 of that statute reenacted the Civil Rights Act of April 9, 1866. 16 Stat. 144. The Act of May 31, 1870, was amended by the Act of February 28, 1871, 16 Stat. 433. Then the third Force Bill or Ku Klux Act, with which we are here concerned, was enacted on April 20, 1871, to enforce the Fourteenth Amendment. 17 Stat. 13. Meanwhile several Reconstruction Acts in the

20. Secretary of State William H. Seward in his proclamation of July 20, 1868, certified that if the two questionable ratifications were included the amendment had become part of the Constitution. The next day Congress adopted a concurrent resolution declaring that the amendment had gone into force, and directing the Secretary to make proclamation accordingly. Seward on July 28, 1868, issued such a proclamation. Coleman v. Miller, 307 U.S. 433, 448–449, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

21. James, The Framing of the Fourteenth Amendment (1956) 77. To allay doubts, the Act of 1866 was re-enacted, after the Fourteenth Amendment was in force, by section 18 of the Act of May 31, 1870, 16 Stat. 144.

22. This was recognized by President Abraham Lincoln when he issued the Emancipation Proclamation merely as a war measure, the sole constitutional justification for which was to be sought in the federal government's war powers. That its effects should cease upon the restoration of peace, however, was politically unthinkable, and the Thirteenth Amendment was adopted.

narrower sense, dealing with the reorganization of State governments in the conquered territory, were enacted: the Act of March 2, 1867, "to provide for the more efficient Government of the Rebel States", 14 Stat. 428; a supplementary Act of March 23, 1867, 15 Stat. 2; and an amendatory Act of March 11, 1868, 15 Stat. 41. There may also have been other acts, not disclosed by a cursory search.

As Mr. Justice Frankfurter has observed, conditions during the Reconstruction Period were not conducive to the enactment of "carefully considered and coherent legislation". Strong feelings and hasty drafting led to "loose and careless phrasing". United States v. Williams, 341 U.S. 70, 74, 71 S.Ct. 581, 95 L.Ed. 758 (1951). The Ku Klux Act itself, the Supreme Court has noted, "was passed by a partisan vote in a highly inflamed atmosphere". Collins v. Hardyman, 341 U.S. 651, 657, 71 S.Ct. 937, 95 L.Ed. 1253 (1951).

It is regrettable that this whole mass of complex, confusing, historical vestiges of "unhappy, far-off things and battles long ago" has not been repealed and replaced by clearcut and effective legislation designed to meet the problems of today, as Professor Chafee has recommended. Measures improvised to deal with the sudden transition from slavery to citizenship are necessarily ill-suited to a "Great Society" based on an ecumenical equality before the law.

The defects of the existing situation are obvious. 42 U.S.C. § 1983 does not furnish an adequate remedy in meritorious cases. The right to bring a lawsuit against an impecunious policeman can scarcely be considered an effective and complete remedy. Well-designed means of protection, with precise and specific provisions, should be made available. Relief akin to that provided in another field of personal injuries by legislation such as the Federal Tort Claims Act of August 2, 1946, 60 Stat. 842, 28 U.S.C. § 1346, might be appropriate.

At the same time, because of its vagueness and the "ill-defined boundaries" of which Judge Biggs spoke, 42 U.S.C. § 1983 lends itself readily to abuse by encouraging burdensome and vexatious litigation. Roberts v. Barbosa, 227 F.Supp. 20, 21, 23 (S.D.Calif.1964). It fosters weird cases such as Picking v. Pennsylvania Railroad Co., 151 F.2d 240 (C.C.A. 3, 1945), where a railroad was obliged to defend a charge of conspiracy to violate 42 U.S.C. § 1983 simply because as a common carrier it transported the complainants from Harrisburg to New York while they were in the custody of officers of the law for extradition. 151 F.2d at 245–246, 249, 253–254.

We are confronted in this area of the law with another corner of the "unweeded garden" described by Judge Friendly in "The Gap in Lawmaking—Judges Who Can't and Legislators Who Won't", 63 Col.L.R. (No. 5, May 1963), 787. Perhaps the current interest in civil rights, now shared by all three branches of the federal government, will lead to a carefully considered codification of the subject in the light of modern concepts and present-day conditions.[23]

---

**23.** It would be helpful if specific statutory standards and prescribed procedures were adopted, capable of being easily applied and enforced, without resort to vague formulas such as "due process of law". Thus under the present wording of 42 U.S.C. § 1983 the civil liability *vel non* of a police officer for extracting evidentiary material from a suspect's body by means of medical apparatus might turn on such "gossamer distinctions" [United States v. Pink, 315 U.S. 203, 238, 62 S. Ct. 552, 86 L.Ed. 796 (1942)] as whether the process employed merely offends "fastidious squeamishness" or on the other hand is so brutal or crude that it offends "even hardened sensibilities" and "shocks the conscience". Rochin v. People of California, 342 U.S. 165, 172, 72 S. Ct. 205, 96 L.Ed. 183 (1952); cf. Breithaupt v. Abram, 352 U.S. 432, 435 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). But perhaps a certain degree of indeterminism is inescapable since unless a State law enforcement procedure is so outrageous that it *does* offend against canons of fair play and decency so as to amount to a denial of due process, there is no legal justification for instrusion or interference by any branch of the federal government.

In view of our conclusions, it will not be necessary to pass on the issue of official privilege argued by defendants, or to determine whether what is said on that subject in the Picking case (pp. 250–252) has been superseded by later cases: Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).; Perkins v. Rich, 204 F.Supp. 98, 101 (D.Del.1962), aff'd 316 F.2d 236 (C.A.3, 1963); Ginsburg v. Stern, 19 F.R.D. 238; 148 F.Supp. 663 (W.D.Pa. 1956); aff'd 242 F.2d 379 (C.A.3, 1957).

From the foregoing, it follows that defendants' motion to dismiss must be granted. This opinion shall be deemed to embody the Court's findings of fact and conclusions of law with relation to said motion.