**Darius R. LOVELACE, a minor, by his father and next friend, Jesse Lovelace; and Jesse Lovelace in his own right, Plaintiffs,**

**v.**

**LEECHBURG AREA SCHOOL DISTRICT et al., Defendants.**

**Civ. A. No. 70–146.**

United States District Court,
W. D. Pennsylvania.

March 17, 1970.

Paul L. Hammer, Pittsburgh, Pa., for plaintiffs.

Blair Green, Kittanning, Pa., for defendants.

## OPINION

DUMBAULD, District Judge.

Courts have often been criticized for assuming the role of a "super-legislature"[1] or a "super board of

---

[1]. Justice Brandeis in Burns Baking Co. v. Bryan, 264 U.S. 504, 534, 44 S.Ct. 412, 68 L.Ed. 813 (1925). Likewise Justice Clark said in Witmer v. United States, 348 U.S. 375, 380, 75 S.Ct. 392, 99 L.Ed. 428 (1955): "It is well to remember that it is not for the courts to sit as super draft boards."

education." [2]   In the case at bar we must essay the further role of *arbiter elegantiarum*, and become "the glass of fashion and the mould of form," determining what is seemly and comely and acceptable *vel non* in the matter of masculine juvenile appearance.

What plaintiff (a high school student) claims here is a constitutional right to the preservation and maintenance of his labial hirsute accrescence notwithstanding a provision in the regulations regarding "proper dress" applicable to his school that "Beards and mustaches are not acceptable for male students." (Ex. 1).

Acting in these matters "not by authority of our competence but by force of our commissions," [3] we must also bear in mind the prudent Yankee admonition of Chief Justice Stone that "Courts are not the only agency of government that must be assumed to have capacity to govern" [4] and must resist the current temptation for the courts, whenever there is an unsolved social problem, an unremedied evil, or a blow to be struck for a good cause, to rush in where Congress, the Executive, or the appropriate agencies of local government fear to tread.[5]

Before considering the legal theories advanced, it will be helpful to summarize the facts.

Darius Lovelace, a high school senior eighteen years old on August 11, 1969, of a very presentable appearance and pleasant disposition, has been suspended from school by virtue of his alleged infraction of the above-quoted provision of the Leechburg Area High School fashion code, embodied in the Student Handbook.  The testimony is not clear as to the date or authorship of said provision, but it has been in force since before the incumbency of the current school administrators, and may have been approved by a student council when adopted.  At any rate it has been approved and adopted and enforced against plaintiff by authority of the incumbent school board through its duly delegated high school principal and supervising principal, and by vote of the board itself at two meetings.

The alleged mustache is barely perceptible, and according to the testimony of plaintiff and his parents is of purely natural growth.  He has never shaved or trimmed it.  There was some indication in defense testimony that at the board meeting it was more noticeable than at the trial, but school photographs of plaintiff for sophomore, junior, and senior year show no appreciable difference.  A published photograph from the local Leechburg newspaper in connection with an article about the litigation does not affect our appraisal of the labial hirsute accrescence, which we find to be a natural growth, not artifically cultivated or intentionally manipulated so as to attract attention or constitute a bizarre or impressive spectacle.

2.  Justice Jackson in McCollum v. Board of Education, 333 U.S. 203, 237, 68 S.Ct. 461, 92 L.Ed. 649 (1948).  In the same case he wisely observed that "Nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant law suits."  *Ibid.*, 235, 68 S.Ct.  See also Justice Frankfurter's comment in Minersville School District v. Gobitis, 310 U.S. 586, 598, 60 S.Ct. 1010, 1014, 84 L.Ed. 1375 (1940):  "the court-room is not the arena for debating issues of educational policy. * * * So to hold would in effect make us the school board for the country.  That authority has not been given to this Court, nor should we assume it."

3.  Justice Jackson in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 640, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943).

4.  United States v. Butler, 297 U.S. 1, 87, 56 S.Ct. 312, 329, 80 L.Ed. 477 (1936).

5.  See Gomez v. Lewis, 292 F.Supp. 560, 563 (W.D.Pa.1968); John M. Harlan, "Keeping the Judicial Function in Balance," 49 Am.Bar Assn.J. (1963) 43; Reynolds v. Sims, 377 U.S. 533, 624–625, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Wesberry v. Sanders, 376 U.S. 1, 42, 48, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

Plaintiff's father testified that he had advised plaintiff (and also an older brother) not to shave, for the reason that once the practice of shaving was begun it would have to be continued perpetually. While no medical testimony of a dermatologist (or whatever the appropriate specialty may be) was offered in support of this admonition, it seems sufficiently in accord with general popular knowledge to be accepted as a reasonable basis for plaintiff's personal hygiene habits and practices.[6]

We therefore conclude that the present litigation regarding plaintiff's aforesaid labial hirsute accretion is a genuine, bona fide case or controversy, arising normally out of the circumstances, and not formented for the purpose of litigiousness. Although in the testimony a Mr. Moore of the NAACP and a lawyer from the ACLU [7] were peripherally mentioned, we are satisfied that no quasi-barratrous solicitation of a client to permit his name to be used as a litigant has occurred here, as seemingly may have happened in connection with the school prayer case of the Albert Gallatin school district in Fayette County which was recently before Judge Rosenberg.[8]

Continuing with the narration of the facts, it appears from the evidence that the first occasion for concern about student mustaches at the Leechburg school occurred when a white boy named Michael Bond, aged 14 or 15, in the ninth grade, appeared with a mustache. The student's attention was called to the pertinent portion of the fashion code, which was further explained to the boy's father when he got in touch with the principal. The father had his son take it off.

The most spectacular case was that of Ed Sluko, 17 years old, a senior, white, who cultivated an unusual looking beard combined with a mustache. It had a different appearance on each side of his face. He removed it the next day, after the principal had called his attention to the fashion code. Sluko's mustache did cause disruption in the school, attracted attention and evoked comment among pupils.

Danny Berger, white, was also observed by the principal sporting a very noticeable well-cultivated mustache, and he shaved it off.

Plaintiff was the next instance. As was true of all except Berger, he was reported to the principal by the truant officer (in modern terminology, "Home and School Visitor"), Mr. Hammond, who is also a teacher of Industrial Arts.

Finally, and subsequently, Eugene Whiting, black, 17, a tenth grade student, had a clearly defined, purposely cultivated mustache which he shaved off the next day after the principal admonished him.

Elaborating the details of plaintiff's encounter with the educational establishment, we note that it was on January 16, 1970, that the principal, William Carroll, was notified by Mr. Hammond of plaintiff's alleged infraction of the fashion code. Plaintiff informed Carroll that it was his parent's policy that he should not shave.

The next morning, at 7:30 a.m., plaintiff's father, Jesse Lovelace, called Carroll at his home by telephone, to talk about the mustache, and explaining the family policy.

Concerning this conversation, the two participants give slightly divergent ver-

6. A newspaper article quotes the father as saying shaving caused plaintiff's face to bleed, but this is *dehors* the record· and is disregarded.

7. According to the clipping from the Leechburg paper accompanying the above-mentioned news photo of plaintiff, "Atty. Harry Greuner, spokesman for the American Civil Liberties Union and a lawyer" presented the case for plaintiff at the school board meeting of February 5, 1970. In the case at bar plaintiff was ably represented by a different lawyer, Paul L. Hammer, who had not appeared before the school board.

8. Civil No. 69–558.

sions. Lovelace says Carroll said there would be no problem. Carroll says he said he would check further to determine whether the matter was one where he had discretionary authority to grant a dispensation from the usual standard. (In that connection, he refers to the fashion code provision on slacks for girls, which are forbidden "at school or school activities unless the activities call for this informal dress," *virtute cujus* slacks have been permitted during exceptionally cold weather.)

On January 18th Carroll became convinced that the regulation was so written that he had no discretionary authority with respect to beards and mustaches, and on the 19th he wrote to plaintiff's father (Ex. A):

Enclosed is a copy of the school policy concerning mustaches and beards. This policy is presently in effect for all male students in the High School.

Since you have an objection to this policy, I feel that we should have a personal conference so that I might explain the purpose of the above mentioned policy.

I will meet with you at any time this week that is mutually acceptable.

Having heard nothing from plaintiff's father, Carroll wrote again on January 27, 1970, as follows (Ex. B):

On Monday, January 19, 1970, I sent a letter home with Darius relative to the school policy concerning mustaches and beards.

I offered to explain the purpose of the above mentioned policy at any time during the week of January 19th through the 25th. Since I have not heard from you, I assume you do not wish to discuss the matter.

I must inform you that it is my duty to enforce policies concerning the school and students.

It will be necessary for Darius to remove his mustache before coming to school on Wednesday, January 28th. If it is not removed, I will be forced to suspend him from school until he complies with the rule.

If you wish to appeal this decision, you may contact the Leechburg Area School Board through the Supervising Principal.

On January 28, 1970, plaintiff's father accompanied him to school. The boy was permitted to remain in school that day, Mr. Carroll advising Mr. Lovelace that he could appeal to the board, and pending such appeal the principal would refrain from suspending plaintiff from school.

Carroll was summoned to a board meeting that night, which he attended, but the Lovelaces were not present.

At that meeting, according to the minutes (Ex. 3):

Mr. Rua made a motion, seconded by Mr. Csonka, that if Darius Lovelace, a senior in the high school, does not remove his mustache by Monday, February 2, 1970, he shall be suspended at the close of the school day (February 2, 1970—3:30 p.m.). Motion carried.

On Monday, February 2, 1970, Carroll delivered to plaintiff a letter to his father stating (Ex. 2; Ex. C):

In accordance with a directive issued by the Leechburg Area School Board, Darius is suspended from school effective 3:30 p.m. today.

He may return to school when he complies with the school policy concerning mustaches.

On the following morning plaintiff appeared at school, but was told he must leave, and was not permitted thereafter to attend school until after and by virtue of this Court's restraining order of February 16, 1970.

On February 3, 1970, a telegram was sent to the board over the signature of Jesse Lovelace demanding a hearing "to be held no later" than 24 hours following receipt of the telegram. On February 5, 1970, the board did hold a meeting which plaintiff and his father did attend. According to the minutes (Ex. 3), "Attornies Harry Gruener, Jeffrey

Kay and Blair Green" were also present, Mr. Green being the board's legal adviser. Mr. Gruener was the only spokesman for plaintiff. According to the minutes:

Speaking on behalf of Mr. Lovelace, Mr. Gruener appealed to the Board to reconsider the action taken at a previous meeting concerning the suspension of Darius Lovelace.

At this time the Board went into Executive Session.

When the meeting reconvened, following the Executive Session, the President asked for discussion by any Board Members. No motion was made for further action. Therefore, Mr. Rua made a motion, seconded by Mr. Sherden, that the meeting be adjourned. Motion carried.

From the testimony it may be further gleaned that after the executive session the board did announce that no change had been made in its prior determination of January 28, 1970, regarding plaintiff's mustache. Plaintiff thus knew at that time that his appeal to the board had been unsuccessful. The complaint in the case at bar was then filed on February 10, 1970. On the same day an *ex parte* restraining order was denied and the matter set for hearing. Testimony was taken on February 16 and 17. On the 16th the Court ordered that plaintiff return to school pending disposition of the case or further order of the Court.

We now turn to the interesting legal questions involved in the case.

Ever since Yick Wo v. Hopkins, 118 U.S. 356, 367, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886), it has been plain law that "invidious discrimination" in the administration "with an evil eye and an unequal hand" of a regulation fair on its face is unconstitutional under the Fourteenth Amendment. In that case Chinese laundries were denied dispensation, accorded to other laundries, from an ordinance requiring the business to be conducted in buildings of brick or stone, ostensibly as a safety measure for protection against fire.

Accordingly, it is only natural that plaintiff's first claim is that the mustache code is being administered so as to make plaintiff a victim of racial discrimination. Such a claim presents a surefire *prima facie* case, invulnerable to demurrer or any pre-trial motions to dismiss. A lawyer representing a black client would probably be negligent today if he did not advance such a contention as the first string to his bow (just as a lawyer representing a criminal defendant must be expected to contend that his client's confession was involuntary or the police line-up improperly constituted).

Nevertheless, it seems that inclusion of this charge in the complaint (which was reproduced in full in the Leechburg local newspaper with the headline "Federal Case Alleges 'Color' Is Involved") [Ex. D] may have caused some of the acerbity evinced by the school board in its defense.

As the board contends, and as counsel states the ACLU lawyer at the board meeting of February 5, 1970, conceded, no race issue was actually involved in the incident. *Quoad* the mustaches, the axe (or perhaps the razor) fell equally upon Trojans and Tyrians, *nullo discrimine.*[9]

In support of the racial allegations in the complaint, plaintiff and a schoolmate (Andrea Balbo, a white girl of 17) testified that one day in the hall a domestic science teacher, Mrs. Rose Bryan, was standing outside one of the numerous doors opening off the hall, and after plaintiff had passed her while walking toward the Balbo girl, a voice was heard to utter the solitary word "nigger."

This incident seems incredible and pointless. No reason for such a soliloquy has been shown; or why that word would be spoken without other context. It does not appear that Mrs. Bryan

---

9. *"Tros Tyriusque mihi nullo discrimine agetur."* Vergil, Aeneid, I, 574.

knew plaintiff; it does appear that he was not in any of her classes. It seems more likely that what was heard was an echo from somewhere outside the hallway than that a teacher would engage in such conduct.

But even if she spoke the word, that would give rise to another separate, independent *cause célèbre* or controversy unrelated to the mustache problem. There was no causal connection shown. Plaintiff's mustache was reported to the principal by Mr. Hammond, the truant officer, not by Mrs. Bryan. There is no showing that Mrs. Bryan exercised any spell over Mr. Hammond, or the principal, or, what is most important, the school board.

Furthermore, if she did speak the word, doubtless another team from the ACLU would rush to her defense (or else one or more of the labor unions now trying to transform the teaching profession from a scholarly pursuit into a motley congeries of demonstrating strikers) contending that teachers, like pupils, must have freedom of expression for their personal opinions on controversial questions, where no disorder or disruptive conduct occurs. Tinker v. Des Moines School District, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

With the collapse of the racial issue, the contention that 18 U.S.C. § 245 (the Civil Rights Act of April 11, 1968) was violated likewise disappears. Nothing in this case resembles the situation to which that section is addressed, where a Southern governor stands at the schoolhouse door seeking to bar students from attending school because of their race or color. In any event that section is a criminal provision. But if we consider the case under 42 U.S.C. § 1983, the result is the same.

The history of that legislation, drawn from section 1 of the Act of April 20, 1871, 17 Stat. 13, commonly known as the "Third Force Bill" or the "Ku Klux Act" is discussed in Negrich v. Hohn, 246 F.Supp. 173, 175 (W.D.Pa. 1965). Mere tortious conduct does not constitute a violation of that section. It is necessary that there be a deprivation of rights which are "secured by the Constitution and laws" of the United States. *Ibid.*, 176, 178.[10] A right of action under 42 U.S.C. § 1983 would therefore be derivative from, and a mere duplication of, a direct violation of the Fourteenth Amendment.

This ultimate and crucial question we now consider. In the first place it is clear that State action is present. Plaintiff is required by Pennsylvania law to attend school, and the defendant school district was duly created and established pursuant to the laws of the Commonwealth. Cf. Hamilton v. Regents, 293 U.S. 245, 262, 55 S.Ct. 197, 79 L.Ed. 343 (1934).

Of what "liberty," then, is plaintiff here deprived? It can only be the liberty of attending high school with a mustache. Is this a privilege recognized as a constitutional right by the Constitution of the United States?

As Justice Frankfurter says,[11] we do not end with the words of the enactment, but we begin there. The language of the Constitution does not speak of mustaches. This species of labial liberty, if it exists, must be sought in judicial interpretation. Can we find it there?

10. It would be most gratifying if prisoners in State institutions were able to grasp this distinction. Every mail from the jail brings to the federal courts handwritten complaints denominated civil rights cases under 42 U.S.C. § 1983. Usually the arresting officer, the prosecuting attorney, and the trial judge are charged with conspiracy to deprive the defendant of constitutional rights, and the gist of the offense is that the jury did not believe the evidence in defendant's favor but blatantly participated in a miscarriage of justice by convicting him.

11. Felix Frankfurter, "Reflections on Reading Statutes," in Alan F. Westin (ed.) An Autobiography of the Supreme Court (1963) 305, 314, 322.

Labial liberty of the motile sort (*i.e.*, speech) is a constitutional right, because it *is* mentioned, and specifically so, in the First Amendment (which is now viewed as applicable to the States, by virtue of its "incorporation" or "absorption" in the Fourteenth. See Dumbauld, The Bill of Rights and What It Means Today (1957) 133–134.)

Therefore "expression," as evidenced by armbands worn in school, has constitutional protection. See Tinker v. Des Moines School District, *supra*. But the Court there pointed out that it was not dealing with non-communicative matters such as dress, hair style, and the like. 383 U.S. at 507–508, 89 S.Ct. 733.

*A fortiori* these limitations would be applicable to student conduct not falling within the sphere of protected expression or communication.

The Court thus reaffirmed the distinction between "pure speech" and controllable conduct, such as violence, obstruction of traffic, flag-burning, and the like. See Street v. New York, 394 U.S. 576, 588–590, 89 S.Ct. 1354, 22 L.

Ed.2d 572 (1969).[12] Compare Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), with Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949). There is analogy here to the distinction between non-communicative conduct and compulsory communication in self-incrimination cases. Cf. Schmerber v. California, 384 U.S. 757, 763–765, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and United States v. Wade, 388 U.S. 218, 221–223, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), with Katz v. United States, 389 U.S. 347, 353 (1967).

What then shall we say concerning skirt length, hair style, and similar matters of appearance and deportment which are not expression or speech?[13] Is there any constitutional right in this area of decorum or mores?

We believe there is not, unless it can be derived (like contraception)[14] by the process of cerebral parthenogensis[15] from primeval darkness and a vague constitutional continuum without form and void. This task should not be per-

12. The pathetic insistence of Chief Justice Warren, in his dissenting opinion in *Street*, that burning the nation's flag should be punishable, notwithstanding all the libertarian notions spawned by the "Warren Court," brings to mind the painful situation of an earlier Chief Justice, described by Robert H. Jackson, The Struggle for Judicial Supremacy (1941) 324–327 as "the lowest point in the history of the federal judiciary". As Taney in Ex parte Merryman, 17 Fed.Cas. page 144, No. 9,487 (1861) closed an opinion "which must rank as one of the most admirable and pathetic documents in American judicial annals * * * did the lonely and frustrated Chief Justice recall the tragic part that he, more than any other, had played" in bringing about the events that led to his humiliation? "Now the weary and weatherbeaten old Chief Justice was overmastered by the violence of the forces that he had himself" unleashed. "One such precedent is enough."

13. It may be noted that some costumes might convey a meaning as "symbolic speech," such as V.F.W. members wearing uniforms in the vicinity of a pacifist

rally. In the case at bar it is clear that plaintiff's mustache was not meant as a message

14. See Griswold v. Connecticut, 381 U.S. 479, 484–485, 487–493, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and comment on that case in Negrich v. Hohn, 246 F. Supp. 173, 179 (W.D.Pa.1965).

15. "It is thus evident that there were underlying English precedents for American principles of constitutional liberty and that their preservation, protection, and enforcement in this country were one of the weightiest of the causes and consequences of the American Revolution.

"It must therefore be acknowledged that the constitutional rights and liberties of Americans are not something that has suddenly and recently emerged as the result of a process of cerebral parthenogensis on the part of the Supreme Court of the United States but are the developing fruit of a tradition with deep roots in our pre-Revolutionary history." Dumbauld, "The Sound Principles of the Revolution," Address to St. Louis Chapter, Sons of the Revolution, February 22, 1967.

formed by a court of first instance.[16] We concede that speculation regarding the nature of the mystery of Ninth Amendment rights is an attractive area for philosophic ratiocination.[17] It harmonizes with the doctrine of John Locke and Thomas Jefferson and other adherents of the Social Contract theory, according to which individuals living in a "state of nature" prior to the establishment of civil society enjoyed certain unalienable natural rights (including, *inter alia,* life, liberty, and the pursuit of happiness), and governments were established by consent of the governed for the purpose of protecting and making secure such pre-existing rights. From this concept of government it follows that, since "the purposes of society do not require a surrender of all our rights to our ordinary governors," there remains reserved to the people after the government is formed "an area of unsurrendered natural rights."[18] One of these, perhaps, is the right to wear a mustache in high school.

We do not ignore certain decisions that hair styles cannot be arbitarily regulated by school authorities, notably Richards v. Thurston, 304 F.Supp. 449 (D.Mass.1969), followed in White v. Beach et al., D.Mass. Civil No. 70–251–W, decided February 11, 1970. In the first of those cases there was no dress code; in the second the Court held that the code was too vague and conferred arbitary discretion upon the principal of the school.

In *Thurston,* Judge Wyzanski said:

This Court takes judicial notice that hair-styles have altered from time to time throughout the ages. Samson's locks symbolically signified his virility. Many of the Founding Fathers of this country wore wigs. President Lincoln grew a beard at the suggestion of a juvenile female admirer. Chief Justice Hughes' beard furnished the model for the frieze over the portico of the Supreme Court of the United States proclaiming "equal justice under law." Today many of both the younger and the older generations have avoided the increased cost of barbering by allowing their locks or burnsides to grow to greater lengths than when a haircut cost a quarter of a dollar.

Whether hair styles be regarded as evidence of conformity or of individuality, they are one of the most visible examples of personality. This is what every woman has always known. And so have many men, without the aid of an anthropologist, behavioral scientist, psychiatrist, or practitioner of any of the fine arts or black arts.

It may also be of interest to note in that connection that even St. Paul, when appealing to the Corinthians to judge for themselves what "nature itself" teaches,[19] "applies the concept to the rather trivial question of wearing the hair long or short, actually a matter of social convention. Even an apostle is not exempt from the human tendency to mistake convention and prejudice for the law of nature."[20]

Though our admiration and affection for Judge Wyzanski is profound and of long standing, we think the eyes of Texas may have focussed more accurately upon the problems of school discipline involved here. See Ferrell v. Dallas Independent School District, 392 F.2d 697, 702–703 (C.A. 5, 1968), where "property" as well as "liberty" was at stake, since the students whose exclusion was there upheld were required by their con-

16. See 246 F.Supp. at 179.

17. See Dumbauld, The Bill of Rights and What It Means Today (1957) 63–64.

18. Dumbauld, The Bill of Rights and What It Means Today (1957) 145.

19. 1 Cor. 11:14.

20. Millar Burrows, An Outline of Biblical Theology (1946) 38. See also Dumbauld, The Life and Legal Writings of Hugo Grotius (1969) 79; and Dumbauld, The Declaration of Independence and What It Means Today (1950) 38.

tract as musical entertainers to maintain "Beatle" haircuts.[21]

Furthermore, whatever view may be taken of the hair question, a distinction emphasized by the defense in the case at bar must be noted. A mustache is different from hair in that not all youths are endowed by nature with the ability to develop a mustache, whereas few if any high school boys are victims of baldness. From the psychological viewpoint therefore regulation of mustaches may be more essential in order to prevent some of the naturally disadvantaged from experiencing feelings of inequality or inadequacy or insecurity or social isolation and rejection. See Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 232–233, 68 S.Ct. 461, 92 L.Ed. 648 (1948); Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

Turning now to the controlling question of substantive due process, we must inquire whether the Leechburg fashion code, as applicable to mustaches, has rational relevance to a legitimate governmental objective.

■ The real issue in the case is therefore whether or not the mustache provision of the Leechburg fashion code is a reasonable regulation, based upon a legitimate State interest in orderly administration of the school system.

When asked why they thought the code provision a desirable regulation, the school officials enumerated grounds which may be summarized as follows:

There is a substantial difference between adults and adolescents of high school age, and between the appropriate degrees of autonomy and discipline which should be accorded to each; in addition to the need of greater guidance and control for the young, there is a need for plain, clear-cut, readily understandable rules, and for uniformity and equality between individuals in the application of such rules; if a uniform rule permitting mustaches *ad libitum* were promulgated in Leechburg high school, there would inevitably be a minority of students who would take advantage of the situation to cultivate weird and bizarre appearing labial adornment which would produce disorder and disruption adversely affecting the normal operation of the school system; and there would also be a minority of male students unable to compete in the "face race" who would suffer the above-described psychological detriment; therefore, the uniform, non-discretionary rule adopted in the Leechburg fashion code is desirable and justified under the circumstances.

We are convinced that there is merit in these reasons. We believe that if the experience of educators were gathered and garnered in the manner made familiar by the Brandeis brief in Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908), and the advantages and disadvantages of total permissiveness and of calculated regulation were weighed, it would be found that a certain degree of regulation is preferable to unrestrained anarchy. We conclude that regulation of labial hirsute accrescence in the case of male adolescent high school students is reasonable and relevant to the legitimate State function of public education, and operation of an effective school system, which at least since the days of Thomas Jefferson has been recognized as a vital feature in the maintenance of democratic government.

In any event the reasoning of the Leechburg school board appears to be as sound and tenable as many educational theories in vogue today. For example, there is the widespread dogma that children should be taught to read without learning the alphabet. Whatever facility in grasping individual words may be inculcated by this method, it would seem that pupils so taught would be at a great disadvantage in the modern struggle for existence when it comes to "letting their fingers walk through the Yellow Pages."

21. But see Calbillo v. San Jacinto Junior College, 305 F.Supp. 857, 860 (S.D.Texas 1969).

And then there is the current vogue for "polychromatic pedagogy," to be effectuated by "chromatic cross-hauling." Under this theory the excellence of a school is not to be measured by the ability of its teachers or the appropriateness of its curriculum,[22] but by the degree of differentiation or variegation in the color or pigmentation of the pupils' skins. To attain this desideratum, large sums of money are squandered for bus rides, not for the purpose of bringing pupils from a sparsely-populated rural area to the nearest school,[23] but to transport them to a school more distant from their homes than one otherwise available, for the sole reason that in the more distant school the chromatic components of the classroom population will present a more desirable degree of diversity.[24]

Thus in comparison with many widely accepted modern educational doctrines, we are persuaded that the Leechburg dress code cannot be judicially pronounced to be lacking in rationality or in relevance to the legitimate functions of public education today.

But though we find the Leechburg regulation reasonable and valid, we are not persuaded of its reasonableness as applied to plaintiff. His mustache is *de minimis* and practically imperceptible. It is merely a natural growth, not a cultivated adornment. We do not believe that plaintiff has violated the code. To exclude him from school for such a non-violation is arbitrary, and a violation of due process. Thompson v. City of Louisville, 362 U.S. 199, 204, 206, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); Garner v. Louisiana, 368 U.S. 157, 173–174, 82 S. Ct. 248, 7 L.Ed.2d 207 (1961).[25]

Accordingly, we order that plaintiff continue in school. If an appeal is taken, perhaps his graduation will render the case moot before its formal termination. This opinion shall be deemed to embody the Court's findings of fact and conclusions of law.

---

22. Instead of Mark Hopkins on a log with a pupil sitting on the other end of the log, a quadripartite arrangement at least would be necessary: one white and one black teacher, and one white and one black pupil.

23. This calls to mind the comment of the Fayette County philosopher who said that when he was a boy he walked four miles to school, but "now they hire a man to haul them to school and then hire another man to give them athletic exercises after they get there."

24. Those who believe that "whatever is good for General Motors is good for the country" should be firm advocates of "chromatic cross-hauling", whatever its educational value *vel non* may be. However, with the development of the Super-Sonic Transport, to which the Nixon Administration has given high priority, it may soon prove possible to improve the Chicago schools by flying in Chinese children from California, Mexicans from Texas, and Porto Ricans from New York, in order to achieve greater diversity than is attainable by means of bus transportation alone. But such interstate commuting might necessitate a larger degree of federal funding than may be thought consistent with efforts to "cool off the economy."

25. The situation brings to mind an anecdote about Bertrand Russell, the well-known English mathematician and agnostic who recently died at an advanced age. A lady at dinner asked Lord Russell what he would do if he were wrong and should meet God face to face in the hereafter. The philosopher's face lighted up and he replied, "Why, I should say, 'God, you gave us insufficient evidence!'" The New Yorker, February 21, 1970.