Sammie J. ALEXANDER et vir., Plaintiffs,

v.

NORTHERN ARIZONA COUNCIL OF GOVERNMENTS, Defendant.

Civ. A. No. 75–283.

United States District Court, D. Arizona.

March 31, 1978.

Judis R. Andrews, Phoenix, Ariz., for plaintiffs.

Lloyd Anderson, Flagstaff, Ariz., for defendant.

## OPINION

DUMBAULD, Senior District Judge.

This action was brought under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U.S.C. § 2000e et seq.

42 U.S.C. § 2000e–2(a)(1) provides that it shall be an unlawful employment practice for an employer "to fail or refuse to hire . . . or otherwise to discriminate against any individual with respect to . . employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(j) makes clear that there is no requirement to "grant preferential treatment" because of race or racial imbalance.

Thus to prevail in this action plaintiff must establish discrimination because of race rather than mere violations of appropriate bureaucratic procedure.

Plaintiff, of the black race, was employed by the predecessor of defendant in the "Head Start" program, where she had helped Molly H. Nelson on occasion and was thus familiar with, and applied for, the position of "Head Start Project Director" in the four northern Arizona counties when Mrs. Nelson resigned.

The announcement of the vacancy (DX–A) indicated a B.A. in early childhood edu-

cation was required; M.A. preferred. Plaintiff has only an associate degree in practical theology from a two year college, having studied at Miracle Valley Bible College and supplemented her education with various correspondence courses and workshops. However, there seems to be no real doubt as to plaintiff's qualifications, and she was encouraged to apply by Mr. Leon H. Berger, Executive Director of NACOG,[1] who was to make the appointment. This may have been done to promote in-house "motivation," or "participation" or "upward mobility;" or it may have been done to enlarge the pool from which the selection was to be made.[2] It is wholly unlikely that it was a deliberate attempt to lull plaintiff into an untenable position and then "pull the rug" from under her. The successful applicant had a B.S. (DX–D).

By letter dated January 2, 1974, plaintiff was informed that Jo Ann Marie Hoaglund Roberts had been chosen for the job (PX–6). [A third applicant, Mary Beth White, had also been considered.]

Plaintiff promptly on January 10, 1974, wrote to Berger's deputy Allen R. Heinze "requesting an appeal hearing with the Executive Committee of the Head Start Policy Board, the N.A.C.O.G. Executive Director, Leon Burger, and yourself because I was not granted the courtesy of an interview; and I assert that Head Start guide lines were not followed. I also question affirmative action policies and procedures." (PX–9).[3]

This threefold complaint is the *sedes materiae* of the instant litigation.

One would have supposed that the appropriate administrative recourse to appeal an action by Berger would have been to his superiors, but he testified that under the pertinent regulations the appeal should first be considered by his subordinates and go to him. Accordingly, as he says he was duly empowered to do, he set up a "fact-finding committee" composed of two subordinates, and a NACOG consultant. (DX–G) The chairman of the committee, Russell E. Clark,[4] testified, and one wonders why the defense called him. His recollection was very vague. One interesting circumstance is his using a tape recorder to help him write his report. He says he never needed to play back the tape. Plaintiff was promised a copy but never received it. The tape has now disappeared.

The committee's report, submitted to Berger by Clark on February 19, 1974, stated that "we are unable to adequately evaluate allegations 2 & 3. None of the committee members are experts in Head Start Policy" (PX–9A).

With respect to the interview issue, however, the committee made a succinct determination with which the Court agrees: "Mr. Berger knew all three applicants quite well by virtue of their NACOG staff positions. He had access to their personnel records and first hand knowledge of their performances in their particular program areas" (PX–9A, unnumbered page 4 of the exhibit).

Moreover, the testimony on both sides shows that Berger did in fact conduct an

---

1. This customary abbreviation will be used for defendant North Arizona Council of Governments (incorporated in 1975) and its predecessor organization, a consortium or association of local governmental bodies acting pursuant to Arizona legislation (effective June 20, 1968) authorizing joint exercise of powers by public agencies as specified in A.R.S. § 11–951—§ 11–954.

2. As the poet Horace says, it is pleasing to draw from a heaping granary and to drink from an abundant fountain:

"Atque suave est magno tollere acervo.

     *   *   *   *   *   *

. . . magno de flumine mallem

Quam ex hoc fonticulo tantundem sumere."
       Horace, Satires, I, lines 51, 55–56.

3. Of some significance, perhaps, in assessing plaintiff's qualification for the job she sought is the circumstance that her letter is addressed to "Alan Hines" with copy to Leon "Burger."

4. The other subordinate of Berger's, Mel Hannah, is black, and testified. The consultant was Dr. Wade Harrison. Hannah testified that he would have found against NACOG if the evidence had warranted it, but concluded that there was no evidence of racial discrimination.

informal or "impromptu" interview with plaintiff lasting more than an hour. During this discussion she set forth her "projections" concerning the work to be done in the pending job, and it seems harmless error if Berger did not formally declare "This is an interview" before beginning the discussion. There is no reason to doubt Berger's testimony that he similarly interviewed the other two applicants in the same incidental fashion.

■ The Court is unable to conclude that plaintiff's first allegation, regarding denial of an interview, amounts to racial discrimination in violation of 42 U.S.C. § 2000e–2(a)(1).

Subsequently, after correspondence with plaintiff, the HEW counsel's office ruled that plaintiff was entitled to an appeal to the Personnel Committee under Rule 17 of NACOG Personnel Rules and Regulations. (PX–15; PX–35).

A second committee, called in the course of testimony the grievance or personnel committee, composed of five members, was accordingly established by Berger on May 23, 1974 (PX–17). The issues were the same as those stated in plaintiff's letter of January 10, 1974 (PX–9) referred to above.

On July 31, 1974, the committee delivered its report (PX–21; DX–M). In addition to the statement of Jess Swanson, the reporter, individual expressions by Andy Tomlinson and Nancy L. Spriggs were offered. There was agreement that there was no evidence of racial discrimination but that Berger's decision against appointing plaintiff "may have been influenced" by "evaluative comments" made by Jo Ann Roberts, the acting director who ultimately received the appointment.

This refers to the "day care" problem, raised by a memorandum of December 20, 1973, probably from Jo Ann Roberts to Stan Walker.[5] Plaintiff regards this as "dirty

campaigning" by Roberts for the permanent job. Ironically, the fact that Roberts was experiencing "an administrative problem" because of the confusion between "head start" and "day care" programs might, on the contrary, be indicative of lack of administrative ability on the part of Roberts rather than of plaintiff. In any event, Berger called a meeting to iron out these difficulties.

Apparently head start funds can not be used for day care, but day care funds may be used for head start programs (since a custodial component equivalent to day care is involved in the assembling of children for the supposedly educational activities involved in head start).

At one point in time the Flagstaff head start program lasted all day; later, because of lack of funds, the hours were shortened, closing at 2 P.M. But the Flagstaff working mothers need to entrust their children to a custodial agency for the entire working day (PX–39).

Hence, various sponsoring agencies were lined up to obtain day care funds (called Title IV money) from the Arizona State welfare department. These funds were used to provide day care for head start children during the later hours of the day when the head start funds were insufficient. (See PX–37).

Apparently plaintiff as contracting party with the State of Arizona obtained Title IV money to be used for extended day care after the head start closing hour of 2 P.M.

After the meeting inspired by the Roberts memorandum, Berger concluded that head start was the only program sponsored by NACOG; that plaintiff was a full time head start employee; that NACOG could not offer day care and should not permit utilization of its personnel or facilities for day care services; and accordingly the Title IV money on hand in the account main-

---

**5.** The "from" and "to" portions of the memorandum on the left margin are detached. PX–8.

tained by NACOG should be returned to plaintiff who was responsible as the contractor with the State (PX–11, 11–A, 11–B, 13, 14, 14–A, 38; DX–H).

This entire day care imbroglio is a collateral matter having no connection with the case at bar except for the fact that Berger set forth plaintiff's involvement in it as "a factor in the decision that I made with regards to a promotion in our agency." (PX–11).[6]

In Watergate terminology, it is not too clear "what Berger knew about the day care problem, and when did he know it."

Plaintiff would infer that it is an *ex post facto* fabrication.[7]

On the witness stand Berger asserted that while it was not until later that the problem came to a head, he was familiar with the situation in its incipiency at the time of his decision to hire Roberts rather than plaintiff.

It is entirely possible for an administrator in day to day contact with those he supervises to perceive the likelihood that an inchoate or latent situation may evolve into a full ·scale "headache," and to form an impression as to the skills shown by the parties concerned in handling the subject matter involved.

It seems very likely that plaintiff, being basically a teacher having direct contact with and concern for children, and cherishing religious values and a love of music, might well have been thought by Berger to be less suitable than Roberts for a position chiefly involving "paper pushing," compliance with federal guidelines, policies, proce-

dures, and regulations, and similar matters of administrative routine and detail.

It is also quite in accordance with human nature that once plaintiff indicated unwillingness to acquiesce in Berger's decision and evinced her intention to "make a federal case" out of it, he decided to elaborate upon and embellish his inchoate thought processes and to undertake to magnify her deficiencies to the utmost.

■ In any event, even if Berger exaggerated the importance of plaintiff's shortcomings as an administrator, and stretched existing regulations, and even if such regulations were ambiguous, uncertain .or conflicting, his fault can not be brought within the category of racial discrimination. It may be more aptly described as bureaucratic bungling.[8]

The Court is thus unable to conclude that plaintiff has established a case of racial discrimination.

Hence it is unnecessary to consider defendant's interesting contention that the incorporated NACOG is not responsible for the acts of its predecessor association, and that such predecessor was not a suable entity. It is true that defendant's articles of incorporation (DX–R) do not expressly refer to any succession to the liabilities of the former organization;[9] and that the joint exercise of powers legislation of 1968 does not specifically speak of power to sue or be sued. But A.R.S. § 11–954 indicates that existing powers or liabilities of local units of government are not enlarged or diminished, and Rule 17(b) FRCP would seem to authorize suit against an unincorporated as-

---

**6.** Letter of February 7, 1974. In an earlier letter of January 15, 1974 (PX–9–B), Berger also referred to "evaluation of the Flagstaff program" and states that "we considered your competency in your present role as part of our decision."

**7.** "Mr. Berger, I find it difficult to believe that such a [*sic*] intelligent man as yourself needs more than 1 month to think of your reasons for not hiring me as Head Start Director." (PX–14–A). The Roberts memorandum of December 20, 1973, is regarded by plaintiff as the

*terminus a·quo.* The appointment was made on or before January 2, 1974 (PX–6).

**8.** See PX–25; and DX–M, p. 5, where NACOG procedures were described as "incredibly inept."

**9.** But cf. the doctrine of succession set forth in *John Wiley & Sons v. Livingston*, 376 U.S. 543, 550–51, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

sociation in its common name rather than specifying each component individually.

Under the circumstances, each party should bear its own costs and counsel fees.

This opinion shall be deemed to include the Court's findings of fact and conclusions of law. We shall also adopt and file such findings of fact and conclusions of law submitted by the parties as seem substantiated.

