Jane J. FLUCKER, Plaintiff,

v.

FOX CHAPEL AREA SCHOOL DISTRICT, Defendant.

Civ. A. No. 74-633.

United States District Court, W. D. Pennsylvania.

Dec. 18, 1978.

**1204**

Joseph M. Maurizi, Balzarini, Walsh, Conway & Maurizi, Pittsburgh, Pa., for plaintiff.

Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for defendant.

## OPINION

DUMBAULD, District Judge.

Plaintiff, a female teacher of English, brought this action against defendant school district, alleging violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U.S.C. § 2000e *et seq.*, by reason of the fact that a male was selected to fill a vacancy at O'Hara junior high school and plaintiff was not.

42 U.S.C. § 2000e–2(a)(1) provides that it shall be an unlawful employment practice for an employer "to fail or refuse to hire . . . or otherwise to discriminate against any individual with respect to . . employment, because of such individual's race, color, religion, sex,[1] or national origin."

Thus to prevail in this action plaintiff must establish discrimination be-cause of sex rather than mere shortcomings with respect to accepted academic practice. For example, plaintiff complained that she had not been interviewed along with twenty-four other applicants by the three administrators who made the selection; but they saw no need to interview her when they knew her because of her work as substitute teacher in the school system and they had prior reports evaluating her performance. Different treatment in this respect would not constitute sex discrimination. See *Alexander v. Northern Arizona Council of Governments*, 447 F.Supp. 1364, 1365–66 (D.Ariz.1977). Similarly, the mere fact that plaintiff might in fact be better qualified than the successful applicant would not *per se* constitute sex discrimination[2] (though it might be evidence of such discrimination if corroborated by convincing proof that the real reason for the selection of the successful applicant was his sex).[3]

We begin our consideration of the case with the observation[4] that it is not the function of federal courts to serve as administrators of the educational system. *Lovelace v. Leechburg Area School District*, 310 F.Supp. 579, 580 (W.D.Pa.1970). As stated recently by Mr. Justice Stevens in *Bishop v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976), "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs."

---

1. As to the legislative history of the inclusion of sex as a forbidden basis of discrimination, see *Bradford v. Peoples Natural Gas Co.*, 60 F.R.D. 432, 434–35 (W.D.Pa.1973).

2. Mere bad judgment in selection would not amount to sex discrimination any more than a court's error in deciding a case would amount to denial of due process. *Chicago Life Ins. Co. v. Cherry*, 244 U.S. 25, 30, 37 S.Ct. 492, 61 L.Ed. 966 (1917) [Holmes, J.].

3. Likewise it would not prove sex discrimination if the reason Thomas G. Healey, Jr., was selected was because he would accept a minimum salary of $8,000 while plaintiff's mini-mum was $9,300, and the district was austerity-minded (DX–1, DX–2). Apparently Healey's actual salary for 1973–74 would have been $10,400 if, like plaintiff, he had had a Master's degree (DX–14).

4. We likewise point out that if an assistant professor is not entitled to re-employment after expiration of a temporary contract [*Board of Regents v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)], *a fortiori* plaintiff had no tenure right to be employed to fill a new vacancy, in a position which she had never held.

It is fortunate that it is not the task of the courts to manage schools.

 For if this Court were the appointing agency, plaintiff quite probably would have been chosen. As a graduate of Smith College, with over three years' experience in the Princeton, New Jersey high school, with a face out of Botticelli and the charm of Southern speech, how could she possibly lose out in competition with a graduate of West Liberty State College (apparently an obscure institution in West Virginia) who in Upper Marlboro, Maryland, had taught "Mass media, Revolutionary Lit., Myths, & Legends, Journalism" and who wrote in his application:

"Any *new* method of teaching such as:
(1) Team Teaching . . .
(2) Differential Staffing . . .
(3) Flexible Scheduling . . .

have been around for more than a decade, and deserve wider application in humanizing the classroom"? (DX–2).

Another pertinent preliminary comment is that no pattern of anti-feminism in the defendant school district appears *a priori* to exist, when it is noted that prior to the vacancy which plaintiff wished to fill the ratio of female to male teachers in O'Hara junior high school was 6–0. (DX–13A).

We proceed, therefore, to consideration of what the record shows to have occurred when Healey was selected to fill a vacancy in the O'Hara English department and plaintiff was not.

In the summer of 1973 a vacancy in O'Hara Junior High was created by the transfer of Mrs. Paula Fantaski to the Senior High School. A vacancy occurred in Dorseyville Junior High by reason of a teacher's leave of absence for a year, with little likelihood of his return at the end of his leave. To fill these two vacancies, Dr. Jack Roush, then Secondary Education advisor, in the ordinary course of his duties, activated the selection process for the purpose of filling these vacancies.

From the 298 applications on file (including plaintiff's) about 24 likely prospects (not including plaintiff) were selected for interview. At half hour intervals each of these candidates was interviewed collectively by Dr. Roush, Terence Keegan, the principal at O'Hara, and Charles Lodge, the principal at Dorseyville.

The Court has had difficulty all along in overcoming a tendency to treat the elimination process as a tennis tournament, so that if an applicant was not in the original 24 that applicant would not be included in the top 5 and the top 2 in later rounds.

However, all three participants in the selection process explained that the 24 who were interviewed were persons who had not been previously interviewed. It was not necessary to interview plaintiff, since reports of evaluative interviews regarding her performance were already on file.

The testimony indicates that plaintiff was among the candidates from whom each of the three participants independently and without consultation selected his top 5. It was agreed that number 1 on each man's list would receive 5 points, number 2 would receive 4 points, and so on. The candidate with the highest number of points would be number 1 on the final list, and the second highest number 2.[5] Plaintiff's name did not appear among the top 5 chosen by any of the three participants. Healey was number 1 on all three lists. Dr. Roush and Lodge named Barbara McFarland as number 2, while Keegan chose Sharon Oster. But Sharon Oster was number 3 on the other two lists, and thus received a total of 10

---

5. Interestingly, the same system of voting was used to select the architect to remodel the Sumner Welles mansion in Washington when it was acquired as the headquarters of a prominent club of savants:

"Horace Peaslee, Julian Berla, and Louis Justement, had been voted upon by the participating architects by a weighted ballot (3 points for first place, 2 for second, and 1 for third). Berla and Peaslee each received four first choices and Justement three, but Berla received twenty-six points to twenty for Peaslee and Justement. Berla was accordingly recommended . . . as the architect of the renovation." Wilcomb E. Washburn, *The Cosmos Club of Washington: A Centennial History 1878–1978* (Washington, 1978) 62.

points while Barbara McFarland received only 8. Sharon Oster was therefore number 2 in the final choice.[6]

After Healey and Oster were selected, it remained only to decide which teacher would be assigned to which school. At this point, the triumvirate testify, Mr. Keegan indicated his preference for the male victor in the voting, Healey, in order to balance his staff of English teachers, where females predominated, as previously noted, by 6 to zero. That assignment was accordingly made.

The triumvirate testifies that sex was never a factor in the voting, and that Keegan's preference for a male was not expressed or manifested in any way until the two teachers had been selected, and the question of assignment was under consideration.

In rebuttal, Mrs. Fantaski testified that in a conversation in the spring of 1973 when talking about her prospective transfer, Keegan said he would like a man to fill the vacancy caused by her transfer.

But, as the Court asked counsel in the argument, is that fact (assuming that it occurred) any different from the wish often expressed by prospective parents that they would like to have a boy? Without more, it fails to prove any manipulation of the generative (*lege* selection) process in order to bring about the desired result.

The point that troubled the Court was to determine when and how plaintiff was eliminated from the running. Was she ever considered at all?

In response to a question by the Court, Dr. Roush with the spontaneity of *res gestae* said that plaintiff was considered, by himself at least, in making his five selections, and that it was the policy of the School Board, which had distinctly instructed the administrators, to consider all substitute teachers for permanent positions be-

coming available. Dr. Roush was able to name a "Mrs. Potter," as another substitute teacher whom he had considered. The Court considered this testimony to be unpremeditated and truthful.

Assistant Superintendent Christy also testified repeatedly that he had instructed Dr. Roush to consider Mrs. Flucker along with all other substitute teachers for the positions under consideration.

Consequently we conclude that plaintiff was duly considered in the course of the selection process, and suffered no disadvantage on account of her sex, but was merely a victim of the normal hazards involved in any selection process where there are more applicants than jobs. In the previously quoted words of Mr. Justice Stevens "We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs."

Judgment shall be entered against plaintiff and in favor of defendant. This opinion shall be deemed to constitute the Court's findings of fact and conclusions of law. The Court also adopts such findings submitted by the parties as are sufficiently substantiated.

---

**6.** The details of voting appear in DX–11, a document prepared by Dr. Roush in consultation with Keegan and Lodge after litigation was instituted. Plaintiff urged that this exhibit be excluded as a self-serving fabrication *post litem motam*, and that all the testimony of the three

participants is likewise an incredible fabrication, since no original documents showing the votes received have been preserved. But it seems normal human nature to throw out the work papers after they are *functus officio* and the final choices have been made.