Lindy Sue GRKMAN, et al., Plaintiffs,

v.

Robert G. SCANLON, et al., Defendants.

Civ. A. No. 81–1086.

United States District Court,
W. D. Pennsylvania.

Dec. 28, 1981.

Ralph Saunders, Pittsburgh, Pa., for plaintiffs.

Marlene Jackson, Commonwealth of Pennsylvania, Dept. of Justice, Thomas Rutter, Jr., James Flaherty, Baskin & Sears, Pittsburgh, Pa., for defendants.

OPINION

DUMBAULD, Senior District Judge.

In the case at bar the Court is again called upon unwillingly[1] to function as a super-superintendent of schools. In that capacity, as Justice Robert H. Jackson noted, "we act in these matters not by authority of our competence but by force of our commissions." *Board of Education v. Barnette*, 319 U.S. 624, 640, 63 S.Ct. 1178, 1186,

---

1. *Lovelace v. Leechburg Area School District*, 310 F.Supp. 579, 580 (W.D.Pa.1970); and *Flucker v. Fox Chapel Area School District*, 461 F.Supp. 1203, 1204 (W.D.Pa.1978).

87 L.Ed. 1628 (1943). The question for decision is where an eight-year old deaf girl shall receive an "appropriate" education as mandated by federal law.

Congress provided, by the Act of April 13, 1970, 84 Stat. 178, 20 U.S.C. § 1413(a)(2), federal subsidy for States declaring their acceptance of "the goal of providing a free appropriate public education for all handicapped children." A "public" education includes one furnished in a private school but paid for from public funds if handicapped children "are placed in or referred to such [private] schools" by the State or local educational agency as a means of carrying out the federal requirements, and if the schools meet State standards and children have "all the rights" they would have in public schools. 20 U.S.C. § 1413(a)(4).

The State must establish "procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling or other removal of handicapped children from the regular educational environment occurs only when the nature or the severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B).[2]

The application submitted to the State by the local educational agency or intermediate educational unit[3] must provide assurances that they "will establish, or revise, whichever is appropriate, an individualized educational program[4] for each handicapped child at the beginning of each school year and will then review and, if appropriate revise its provisions periodically but not less than annually." 20 U.S.C. § 1414(a)(5).

Procedural safeguards for the handicapped child and its parents are provided in 20 U.S.C. § 1415. These include written prior notice and an opportunity to complain whenever the local board or intermediate unit proposes to initiate or change the evaluation or placement of the child or the provision of a free appropriate education to the child. 20 U.S.C. § 1415(b)(1)(C) and (E).

When a complaint is made "an impartial due process hearing" shall be conducted [20 U.S.C. § 1415(b)(2)], resulting immediately or ultimately in an "independent decision" upon completion of an impartial review. 20 U.S.C. § 1415(c) and (e)(2). Such decision is final, except for judicial review in State or federal court. In any such civil action "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the

**2.** The policy embodied in this provision is known in educational jargon as "mainstreaming" which is defined by Judge Adams in *Tokarcik v. Forest Hills School District*, 665 F.2d 443 (3rd Cir. 1981) as "the congressionally-approved policy of educating the handicapped, to the maximum extent appropriate, with their non-handicapped peers. If placement in a regular classroom proves infeasible, the 'least restrictive environment' concept governs implementation of the congressional goal of providing the handicapped an equal educational opportunity."

**3.** This term, defined in 20 U.S.C. § 1401(22), describes a State-supervised agency (other than a local school district) which on a regional basis provides special education and related services to handicapped children. We shall hear much of the Allegheny County Intermediate Unit (AIU) during the course of the case at bar.

**4.** This document, known in the trade as an IEP, is defined in 20 U.S.C. § 1401(19). The 11-page IEP in the record of the case at bar, dated May 23, 1979, fully complies with the statute. For practical purposes a skeptic might think it ought to receive the attention of one of the current task-forces seeking to eliminate unnecessary paperwork. Under "Reading" the "Annual Goal" is that "Lindy will acquire and use comprehension strategies and study skills needed to understand and enjoy messages communicated in written language." Does this encourage passing notes in class? Under "Social Studies" the goal is "Lindy will demonstrate an awareness of holidays and special event celebrations." The "short term objective" to be evaluated by "teacher observation" is that "Lindy will demonstrate an awareness that a person's birthday honors the day he or she was born." Does deafness impede enjoyment of birthday cakes and presents? *Et sic de similibus.*

court determines is appropriate." 20 U.S.C. § 1415(e)(2).

■ To determine what constitutes appropriate relief, the Court must in effect determine what constitutes an appropriate education.[5] That this provision of the statute authorizes an action *de novo,* rather than the conventional review of an administrative agency where the order is to be sustained if supported by substantial evidence on the record as a whole,[6] was decided by the Third Circuit Court of Appeals in *Tokarcik*[7], *supra* note 2. The Court there noted that "a judicial suit under the Education Act is practically indistinguishable from the usual civil action in which issues are tried *de novo.*" Perhaps another analogy would be to the review of a rate order of the Interstate Commerce Commission where a constitutional issue of confiscation is raised and additional evidence is sometimes taken in the reviewing court in addition to the administrative record. *Mfrs. Ry. Co. v. U. S.,* 246 U.S. 457, 488–90, 38 S.Ct. 383, 391–92, 62 L.Ed. 831 (1918).

With the legal framework in mind, we turn to the facts disclosed by the record in the case at bar.

Lindy Sue Grkman was born March 12, 1973. When 1½ years old, she was placed in the De Paul Institute, a private school which specializes in training the deaf, and has remained there ever since. For the school year 1978–79 her placement was duly documented under the laws and regulations, and was approved by the school district, the

AIU, and Harrisburg. The AIU had no facilities for deaf children under school age. For the year 1979–80 she became of school age. The AIU at this time did not approve and forward to Harrisburg the placement papers (form DEBE 448 A) taking the position that it *did* operate an adequate facility for deaf children *of school age.* In due course the Secretary of Education directed placement of Lindy in an AIU class, after a "due process hearing."[8] The report of the hearing officer Dr. Thomas D. Marro was dated May 14, 1980. It was approved and confirmed by Secretary of Education Robert G. Scanlon on April 8, 1981. Suit was filed in this Court on July 1, 1981 and hearings held on August 13, 1981 and November 30, 1981. The administrative record was received in evidence[9] at the second hearing, and additional testimony was taken at the first hearing, and in the form of late-filed exhibits after the second hearing.

Inasmuch as the order attacked in the case at bar relates to the school year 1979–80, and a new educational evaluation and placement is to be made annually, the Court made a valiant effort at the first hearing to impel the parties, if they could not settle the case, at least to confer with a view to completing timely re-evaluation before the start of the new school year (1981–82). Nothing came of these efforts, however, and at the second hearing the Court ruled that it would decide the case on the basis of the order under attack even though this amounted to "disposition of a dead horse."

---

5. If this is thought an unsuitable task for a court (see note 1, *supra*), one may take comfort in the fact that sometimes the Pennsylvania legislature confers upon the Courts of Common Pleas, rather than the Public Utilities Commission, the power to regulate public utility service. *Yezioro v. N. Fayette Co. Municipal Authority,* 193 Pa.Super. 271, 286, 164 A.2d 129 (1960).

6. *E.g., Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951).

7. That case also disposes, for present purposes, of the question as to the appropriate statute of limitations, which was uncertain at the time of the first hearing in the case at bar.

8. Plaintiff argues that the evidence at the due process hearing was stale, but there seems little genuine dispute regarding Lindy's condition and little reason to suspect significant change. It is conceded by all that (1) she is *profoundly* deaf, as distinguished from severe or moderate; and that (2) she is bright, with a high I.Q. and no mental defects.

9. The "weight of the evidence" at the administrative hearing was 7 pounds avoirdupois, in contrast to the 67 pounds referred to by Justice Brandeis in *B. & O. R.R. v. U. S.,* 298 U.S. 349, 381, 56 S.Ct. 797, 813, 80 L.Ed. 1209 (1936), where a proceeding before the Interstate Commerce Commission was involved.

Counsel for the AIU stated that such disposition would dispose of later years as well, since no new circumstances had intervened to warrant a different placement. Counsel for plaintiff wished for further proceedings and current data, desiring also to limit the action pursuant to the second hearing to his request for a "preliminary injunction."

The Court concluded and ruled that under 20 U.S.C. § 1415(e)(3) the existing placement must continue until the Court disposed of the case. But the Court doubts whether its pronouncement that the statutory provision mandates the continuance of such placement amounts to a preliminary injunction, as a matter of technical analysis.

Counsel for AIU ingeniously argued that the Secretary's determination constituted the status quo to be continued *pendente lite*. But that determination is the very wrong complained of which the instant proceeding seeks to remedy, and until its validity *vel non* is adjudicated by this Court in the case at bar it can not be given effect as the *status quo ante litem motam*. It is the last uncontested status preceding the controversy which constitutes the status quo to be continued by virtue of the statutory mandate. And in the case at bar that status is obviously the placement at De Paul (which originally took place, when Lindy was under school age, with the acquiescence and approval of all school authorities concerned).

By reason of the continuance of that placement until disposition of the "dead horse" it became proper to dispose of the case as expeditiously as possible, and the Court ruled that no further evidence was admissible unless it was pertinent to the 1979–80 determination attacked in the instant proceedings (without prejudice, of course, to subsequent litigation when and if new placement orders, as required annually, were made and contested by Lindy's parents). Plaintiff's counsel indicated that any such additional evidence would be included, as it was, in the subsequently filed material.

Before proceeding to consider the evidence, and to ascertain what result its "preponderance" indicates, it may be proper to disclose two aspects of this Court's "apperceptive mass" [10] which might be thought on appeal to have unduly affected the Court's reasoning and conclusions reached.

The writer of this opinion was once, now over two decades ago, a Juvenile Court judge in Fayette County. This was in the pre-*Gault* era, and the classical concept of Juvenile Court procedure according to the teachings of Judge Gustav Schramm was accepted and regnant. Accordingly, the purpose of the Court is to further the best interests of the child, within the framework of applicable law, rather than to classify circumstances presented as neatly as possible under relevant technical rubrics and legalistic concepts.[11]

▪ Therefore any power or discretion conferred by Congress on this Court in the matter under consideration will be exercised, within the framework of applicable law, for the furtherance of the best interests of the child. *Begriffsjurisprudenz* and bureaucratic self-fulfilment will be given secondary status.

Furthermore, the writer of this opinion attended Harvard Law School at the same time Solicitor General Erwin Griswold did.[12]

---

**10.** William James, *Psychology* (1892) 326–29.

**11.** I recall an occasion when my colleague Judge Maurice Cohill (also a former Juvenile Court judge) and I testified before a legislative committee at Harrisburg on Juvenile Court matters, and I was amazed and shocked by what I learned on that occasion about the unmanageable volume and heinousness of juvenile crime in Philadelphia. Under such "inner city" conditions the criminalization and constitutionalization of juvenile misconduct was perhaps inevitable.

**12.** Dean Griswold in opening his argument in the Pentagon Papers case [*New York Times v. U. S.*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)] remarked that fortunately both he and his opponent (the late Professor Alexander Bickel) had attended law school at a time when gruelling work to meet a deadline was considered a normal incident of professional life and not a grievance or occasion for psychiatric treatment.

In that era a law student was totally immersed in the law. Whether eating or drinking or talking or studying individually in the library or reviewing in groups or preparing arguments for moot court, he thought of nothing but law during his waking hours. There were few married students. Excursions into the social whirl were rare or disastrous. Visits to Symphony Hall or the Gardner Museum were infrequent. Recreation for amusement was minimal. Exercise for physical fitness was usually on the squash court, which provided the maximum of exertion in the shortest time. Law constituted one's entire universe, the be-all and end-all of life.

Scrutiny of the evidence demonstrates a high level of ability and conscientious dedication on the part of all witnesses. Dr. Edgar Holtz, an AIU administrator, displayed excellent qualities as an educator, though admitting that his line of work was administration rather than teaching deaf children. He freely admitted also that De Paul had an advantage in that the ages of the other pupils at De Paul were closer to Lindy's than would be the case in the AIU class.

Another advantage shown by the testimony is that the degree of hearing impairment in the De Paul class was more uniform. The AIU pupils varied both in ages and in degree of hearing impairment. The AIU class was not composed entirely of gifted pupils but had a miscellaneous range of ability.

As far as can be discerned from a paper record, the hearing officer, Dr. Sarro, was entirely fair and very knowledgeable with respect to education of the deaf. The AIU teachers were also competent and dedicated. The De Paul teachers were likewise expert and experienced. Perhaps to some extent the Court accords greater weight to the views of those teachers who actually know Lindy and actually had first-hand ex-

perience in teaching her than to the AIU teachers unfamiliar with her idiosyncrasies and potentialities. The teachers in each institution were chiefly familiar with their own programs, which they characterized as "appropriate" for Lindy but did not undertake comparison of the two facilities. However, the Court can not escape the task of comparing the De Paul and AIU programs, and determining by "preponderance" of the evidence which placement is "appropriate" for Lindy.[13]

■ As previously intimated, we do not place too much weight on the terms of the "IEP" drawn up to set forth the long and short term goals. Congress when requiring an "individualized educational program" undoubtedly meant to call for a program planned to meet the particularized needs of the particular individual involved. The AIU witnesses in asserting that the AIU program was "appropriate" for Lindy were merely saying that that program was in conformity with and did not transgress the terms of Lindy's "IEP." But that IEP, in accordance with the teachings of a training session sponsored by the AIU on how to draw up IEPs, using general rather than specific terms, did not sufficiently recognize the concrete needs of the particular individual, as Congress contemplated. By generalizing the terms of the IEP so that any respectable program for the deaf would fall within the scope of the IEP, the possibility of finding any such program "appropriate" is increased. The Court in analyzing the evidence must focus on the best interests of the child, rather than upon mechanical compliance with the terms of a somewhat general and inane document.

■ A very significant advantage of the De Paul program, in the Court's opinion, is the fact that De Paul specializes in training the deaf. The entire personnel of the school, including the librarian and dining

---

**13.** The writer of this opinion was once a member of a search committee to secure a pastor for a church after the death of the incumbent. Upon visiting many churches and hearing many sermons the report concerning those scrutinized usually was: "He might do if we can't get anyone better." But he was not "appropriate" for the congregation concerned. Awareness of alternatives can not be eliminated from the decision as to appropriateness, as well as awareness of the standards accepted as goals.

room attendants, are certified teachers of the deaf. This means that every experience of the child during her entire school day is oriented toward learning pertinent communication skills.

On the other hand, in the AIU class, pupils of Lindy's age would be taught only part time by the teacher trained to teach the deaf. At other times they would be sent out to mingle with "normal" pupils and teachers in the library, study hall, dining room, and the like. On behalf of this practice it is urged that it advances the goal of "mainstreaming." It promotes "socialization," but it does not promote maximum effective utilization of the pupil's time in obtaining skills necessary for a deaf person. "Socialization" can be sufficiently furthered out of school. If undertaken prematurely, when the pupil has not sufficiently acquired the necessary communication skills, it might have traumatic consequences or result in regression. At least it would delay or impede otherwise attainable progress in such skills.

The evidence is persuasive that such skills are at present Lindy's principal need. Championship prowess will sooner be attained if she concentrates on intensive training and learning to swim before she plunges unprepared into the turbulent mainstream. When her strokes are stronger she will be able to make better headway in the water.

A sound maxim in sports is "always change a losing game—never change a winning game." The aphorism applies here. At present Lindy is making satisfactory progress in her present educational environment. It is important to maintain "momentum." The risks of change outweigh the possible benefits. It is a suitable time to do nothing.[14] Next year, or the year after, it may be a new ball game. *Primum non nocere* applies in education as well as medicine.

Plaintiff argues that because of Lindy's shyness it would be traumatic psychologically to change her placement. We are not overly impressed by this possibility, but it is one possible risk to consider in making the risk/benefit calculation. Any change from familiar places and people is painful to anyone, but it is an inescapable part of life: "partir, c'est mourir un peu." One is reminded of the experience of Thomas Jefferson's younger daughter Polly when her father sent for her to rejoin him in Paris while he was American minister there. She was then nine, about a year older than Lindy Grkman. Unwilling to leave her Aunt Eppes, she was tricked by playing and romping with her cousins on board the ship until she fell asleep and they disembarked. Then it proved especially difficult and painful to separate her from the ship's captain to whom she became attached, when Abigail Adams took charge of her in London. Then when Jefferson's maître d'hôtel Petit came to take her on to Paris the separation from Mrs. Adams was again a sorrowful occasion.[15] But no permanent damage was done, and perhaps the consequences for Lindy would not be any more serious.

In conclusion, the Court is satisfied by the preponderance of the evidence that continuance in De Paul was the appropriate educational placement for the school year 1979–80 (and hence for subsequent years, if, as AIU counsel has stated, no significant differences in those years call for any change), and that the appropriate remedy is to direct that the contrary determination by the Secretary of Education of the Commonwealth of Pennsylvania be set aside and for naught holden, and that appropriate financial support for Lindy Grkman's placement at De Paul Institute be forthcoming.

This opinion shall be deemed to embody the Court's findings of fact and conclusions of law.

---

14. As an antitrust client was reportedly advised by Clark Clifford for a large fee. When the client telephoned to ask why, the eminent counselor replied (for an additional substantial fee) "because I said so."

15. Dumas Malone, *Jefferson and the Rights of Man* (1951) 134–36.