Lindy Sue GRKMAN, a minor by Joseph GRKMAN and Denise Grkman, her parents and natural guardians, and Joseph Grkman and Denise Grkman, Plaintiffs,

v.

Robert G. SCANLON, individually and in his capacity as Secretary of Education of the Commonwealth of Pennsylvania, et al., Defendants.

Civ. A. No. 81–1086.

United States District Court, W.D. Pennsylvania.

May 25, 1983.

William C. Andrews, Alton P. Arnold, Jr., Baskin & Sears, Pittsburgh, Pa., Takashi Bufford, Dept. of Educ., Commonwealth of Pa., Pittsburgh, Pa., for defendants.

Ralph J. Saunders, Jr., Pittsburgh, Pa., for plaintiffs.

## OPINION

DUMBAULD, Senior District Judge.

Ordinarily an appellate court is bound to affirm a judgment on appeal when it is free from error. *Binney v. C.&O. Canal Co.,* 8 Pet. 213, 219, 8 L.Ed. 917 (1834). But if the law has changed pending the appeal the appellate court must apply the law in force at the time of its decision. *The Peggy,* 1 Cr. 103, 109–110, 5 U.S. 103, 2 L.Ed. 49 (1801).

After this Court's decision on December 28, 1981, in *Grkman v. Scanlon,* 528 F.Supp. 1032 (W.D. Pa.1981), the Supreme Court decided *Hendrick Hudson District Board of Education v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), and the Third Circuit Court of Appeals on January 21, 1983, in a mimeographed opinion and judgment remanded the cause for further proceedings in accordance with the Supreme Court decision. 707 F.2d 1391.

The Court of Appeals referred to the following passage in the Supreme Court's opinion (—— U.S. at ——, 102 S.Ct. at 3049, 73 L.Ed.2d at 710) as embodying the prescribed standard:

> When the language of the Act and its legislative history are considered together, the requirements imposed by Congress become tolerably clear. Insofar as a State is required to provide a handicapped child with a "free appropriate public education," we hold that it satisfies this requirement by providing *personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.* Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade. (Italics supplied)

Basically two features are essential: (1) specially designed personalized instruction, deviating from the normal routine program offered to pupils generally, and geared to the particular needs of a handicapped child, and (2) related supportive services needed to enable the handicapped child to benefit from the special program provided.

The Court based these standards upon language derived from the statute (—— U.S. at ——, 102 S.Ct. at 3041, 73 L.Ed.2d at 700):

> ... the Act does expressly define "free appropriate public education":

> "The term 'free appropriate public education' means *special education and related services* which (A) have been provided at public expense, under public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title." § 1401 (18) (emphasis added).

"Special education," as referred to in this definition, means "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." § 1401(16). "Related services" are defined as "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a handicapped child to benefit from special education." § 1401(17).

Further illumination of the statutory standard as expounded by the Supreme Court is afforded by other passages of Justice Rehnquist's opinion. The same basic features are again emphasized in another description of the prescribed requirements (—— U.S. at ——, 102 S.Ct. at 3041–3042, 73 L.Ed.2d at 701):

According to the definitions contained in the Act, a "free appropriate public education" consists of educational *instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child "to benefit" from the instruction.* Almost as a checklist for adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP. *Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction,* and the other items on the definitional checklist are satisfied, *the child is receiving a "free appropriate public education" as defined by the Act.* (italics supplied)

The Court made clear that "to require . . . the furnishing of every special service necessary to maximize each handicapped child's potential is, we think, further than Congress intended to go." (—— U.S. at ——, 102 S.Ct. at 3047, 73 Ed.2d at 707).

See also *ibid.* —— U.S. at ——, 102 S.Ct. at 3041, at 701. [The lower court in *Rowley* had espoused that standard.]

It is sufficient, according to Justice Rehnquist, if there is *some* specialized instruction from which the child receives *some* benefit (—— U.S. at ——, 102 S.Ct. at 3045, 3048, 73 L.Ed.2d at 705, 708):

Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be *sufficient to confer some educational benefit upon the handicapped child.* It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education. The statutory definition of "free appropriate public education," in addition to requiring that States provide each child with "specially designed instruction," expressly required the provision of "such . . . supportive services . . . as may be required to assist a handicapped child *to benefit* from special education." § 1401(17) (emphasis added). We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child. (Italics supplied)

The Court also emphasized the importance of procedural safeguards guaranteeing parental participation and input at every stage of the administrative process. Congress regarded compliance with these elaborate and specific procedural requirements as equally or more important than compliance with any substantive standards. (—— U.S. at ——, 102 S.Ct. at 3050, 73 L.Ed.2d at 711).

In conclusion, the Court declared (—— U.S. at ——, 102 S.Ct. at 3051, 73 L.Ed.2d at 712):

Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And

second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

It is important to bear in mind the facts involved in *Rowley.* The Court dealt with a case where the handicapped child was receiving "substantial specialized instruction and related services" and was benefitted thereby, as evidenced by her "performing above average in the regular classrooms of a public school system" (—— U.S. at ——, 102 S.Ct. at 3048–3049, 73 L.Ed.2d at 709). She had some residual hearing and was an excellent lip-reader. She was being provided a hearing aid which amplified words spoken in class, and also received instruction from a tutor for the deaf for one hour each day and from a speech therapist for three hours each week. The litigation arose because her parents insisted that she also be provided with a qualified sign-language interpreter in all of her academic classes.

It was not difficult, therefore, for the Court to conclude that enough was being done for Amy Rowley without requiring the taxpayers to provide a full-time classroom companion for her. It seems a bit much to expect that an additional full-time teacher serving only one individual pupil must be hired every time there is a handicapped child in the class. Such super-service would be akin to the luxurious banquets with a butler behind every guest, which are not a customary feature of everyday life in America. The Court's holding in *Rowley* was necessarily based upon the facts presented in that case, and, in Justice Holmes's phrase, may allow some play in the joints when applied to a different set of facts such as those involved in the case at bar.

Particular differences which may be of importance are that Lindy Sue Grkman is *profoundly* deaf, as distinguished from se-

vere or moderate whereas Amy Rowley retained some residual hearing. She is also more shy in interacting with non-deaf classmates than Amy.

At the hearing before this Court on remand, counsel for the Allegheny Intermediate Unit proposed that a current evaluation and IEP for Lindy be undertaken.

This suggestion is meritorious. The education of a child is an ongoing enterprise. What is needed or desirable at one point in time may be unsuitable later. Growth and development are natural and normal, and should not be thwarted by legalistic technicalities.

There was some discussion at the hearing as to whether or not this case is moot. There is apparently no genuine effort on the part of the Commonwealth to recover money spent on Lindy's education *pendente lite* pursuant to orders of this Court and the approval of the Court of Appeals. Since the IEP involved in the case at bar is obsolete and *functus officio,* there is apparently no truly live controversy at the present time. But there is a possibility, because the law requires annual formulation of a new IEP, that there may be a situation "capable of repetition, yet evading review."

That the legal, educational, and judicial talent employed in this litigation may be most efficiently utilized, it would seem desirable that in addition to the new and up to date law created by Justice Rehnquist in *Rowley* the litigants should have the benefit of new and up to date facts regarding Lindy's development and potentialities, as well as the educational facilities available for her future education.

We may take notice as a matter of general knowledge that the Allegheny County Intermediate Unit has recently suffered from labor trouble and financial curtailment;[1] and that the amount of federal funding for all education has diminished. What effect, if any, these circumstances may have on the appropriate educational placement for Lindy should be determined,

---

1. A substantial reduction in force by the Allegheny Intermediate Unit was announced on the evening news the same day that the first draft of this opinion was completed.

and the primary jurisdiction of the State authorities be respected in these and any other inquiries necessary to bring the facts, as well as the law, up to date, in a current and useful determination of the issue involved.

■ Accordingly, the case will be remanded to the Secretary for development of a current factual record and for evaluation of the facts so ascertained in the light of the pertinent legal standards as set forth in *Rowley,* and bearing in mind that a comparative hearing (as in *Ashbacker Radio Corp. v. F.C.C.,* 326 U.S. 327, 333, 66 S.Ct. 148, 151, 90 L.Ed. 108 (1945), with respect to issuance of radio station licenses) is required in order to determine the most appropriate alternative available, rather than a determination as in *Rowley* whether a particular special education program should be augmented by an expensive increase in staff for the benefit of a single pupil.