Jennifer VISCO, a minor, by Rita Mae VISCO, parent and guardian, and Rita May Visco, in her own right, Plaintiffs,

v.

SCHOOL DISTRICT OF PITTSBURGH, et al., Defendant.

Civ. A. No. 84–1377.
Related No. 84–1378.

United States District Court,
W.D. Pennsylvania.

April 28, 1988.

Ralph J. Sanders, Pittsburgh, Pa., for plaintiffs.

David Dille, Asst. Sol., Pittsburgh, Pa., for School Dist. Pittsburgh, Pittsburgh Intermediate Unit 2 Wm. W. Penn.

Thomas Halloran, Deputy Atty. Gen., Pittsburgh, Pa., for Dept. of Educ. and Robert C. Wilburn.

## OPINION

ROSENBERG, District Judge.

I do not refer to this case as "this matter" because of the nature of the case and our fundamental concern for tender children. Additionally, I look at this case as symbolic of that which is a national deficiency. The President and United States Congress recognized this deficiency and created in 1986, the Commission on Education of the Deaf. The Commission's 144–page report, "Toward Equality: Education of the Deaf" was made to the President and Congress. COMMISSION OF EDUCATION OF THE DEAF, TOWARD EQUALITY: EDUCATION OF THE DEAF (1988). The Commission reports that there are a meaningful number of young deaf children who are not receiving a free appropriate education with the full benefits as Congress had intended they should have when it enacted The Education of the Handicapped Act of 1975.

This case is brought before me by Mrs. Rita Mae Visco on behalf of two of her minor children, Jennifer Visco, age 13, date of birth, August 20, 1974, and Rene Visco, age 11, born on September 15, 1976. Mrs. Visco, Jennifer and Rene are all hearing-impaired. Both children reside with their mother in the School District for the City of Pittsburgh.

Jennifer and Rene continue to attend DePaul Institute, a private school that specializes in educating the hearing-impaired. Only hearing-impaired students attend DePaul. Jennifer and Rene have both progressed from grade to grade at DePaul and both are good students.

In the fall of 1981, the School District evaluated Rene and Jennifer and produced an Individualized Educational Plan (IEP) for each student. Based on each child's IEP, the School District recommended that Jennifer should be placed in a special program for the hearing-impaired at the Liberty School and that Rene should be placed in a different program for the hearing-impaired at the Beechwood School. The Liberty School and the Beechwood School have programs for the hearing-impaired developed by the State, and these programs are held presumably put into effect in the defendant Pittsburgh Public School System.

Visco rejected both proposals and requested an administrative hearing regarding the placement of both children. A hearing was held for both children, where the hearing officer of the Department of Education agreed with the decision of the Pittsburgh School District to move Jennifer and Rene from DePaul to the Liberty and Beechwood Schools, respectively. The Hearing Officer's decision was then appealed by Visco and affirmed by the Secretary of Education of the Commonwealth of Pennsylvania. Mrs. Visco rejected the Secretary's decision and filed the instant action with this court.

Visco, as plaintiff, avers in her complaint that DePaul provides for the special needs of Jennifer and Rene. Furthermore, she objects to the removal of Jennifer and Rene from DePaul. Plaintiff claims that the city schools, Liberty and Beechwood, do not have teachers who possess the functional abilities and communications skills that her children specifically need as deaf children living in a deaf househould. The gravamen of plaintiff's complaint, however, is that the School District's programs for the hearing-impaired at the Liberty School and Beechwood School do not provide a "free appropriate education" for her children as guaranteed by the Education of the Handicapped Act of 1975. 20 U.S.C. Section 1401 et seq. (hereinafter referred to as the EHA or the Act). The plaintiff contends that because she and her children comprise a deaf household, there is little emphasis on speech and lip reading at home. This results in a particular need by her children to learn and practice speech, language and lip reading in the school setting so that her children can learn to function as ordinary adults in society. Plaintiff believes the oral-aural program at DePaul is "appropriate" for her children because it heavily stresses these skills in *all* classroom and recreational activities, as opposed to the programs offered at the Liberty and Beechwood Schools. The Beechwood and Liberty programs emphasize *sign language* instead of oral-aural communication for most classroom and recreational interaction. Oral-aural communication is emphasized only in the language class designed to teach these skills. Oral-aural communication is not used in Geography, Math, Gym or other "non-language" classes. In other words, plaintiff contends that since she is hearing-impaired and relies on sign language to communicate with her children at home, school is the only place where Jennifer and Rene can learn and practice oral language and lip reading—skills that are absolutely essential for a hearing-impaired individual to function in society.

This court has acquired a great deal of knowledge concerning education of the deaf, not only from the Commission Report, but from the hearing held where I heard from the two deaf children and the children's mother, as plaintiffs. I listened carefully and was impressed by the testimony of Roberta Konefal, the Supervisor for Special Education for the School District of Pittsburgh. She has set forth her qualifications in the area of education of the deaf and has shown an understanding of their educational dilemma. I heard her testimony on how the deaf are educated, particularly in two schools, the Liberty School and the Beechwood Elementary School, but I have also listened most carefully to the testimony of Sr. Philomena Mannion, the Director of the DePaul Institute for the Deaf. I am aware of the qualifications of this supervising teacher of the deaf at DePaul and I am now aware of the character and credentials of the teachers, as well as, the methods applied in the teaching process of these deaf children. I am also aware of the fact that this institution has been in existence for many years and has grown up with the problems of deaf children and has arrived physically and psychologically with many of the solutions that convince me it is on the road to eventually doing what the President's Congressional Committee will be recommending to resolve the problems which still exist in educating deaf children.

Education of the hearing-impaired has been plagued by debates since the eighteenth century concerning which method of teaching is best. Apparently, there are four basic schools of thought on educating the hearing-impaired: manual instruction,

oral-aural instruction, total communication and cued speech. The oral-aural method and the total communication method are at odds here; DePaul Institute employs the oral-aural method, whereas, the Beechwood and Liberty Schools use the total communications method.

Oral-aural instruction emphasizes the development and use of residual hearing that almost all hearing-impaired children have (auralism) in combination with lip reading (oralism). The residual hearing is stimulated by electronic amplification. The oral-aural method, itself, is a hybrid method of instruction derived from the oralist school of thought, which primarily relies on lip reading. The oral-aural method de-emphasizes the use of lip reading and seeks to have students develop their residual hearing to the maximum extent possible. At times, the instructor will cover her mouth with her hand in order to force the students to rely more on their residual hearing (although the students are still receiving some cues from the instructor's facial expressions). Therefore, the oral-aural method of educating the hearing-impaired teaches lip reading in combination with development of the student's residual hearing. Sign language is not used at all in this method.

The total communication method combines the use of aural, oral and manual method of communication—the type of manual method used most often is Signing Exact English. Signing Exact English employs English syntax in conjunction with speech and finger-spelling. Therefore, the total communication method teaches lip reading and use of a hearing aid along with hand signals. Its appeal is that it offers something for everyone, oralists and manualists. *See generally* Large, *Special Problems of the Deaf under the Education For All Handicapped Children Act of 1975*, 58 WASH. U.L.Q. 213 (1980).

■ It should be mentioned at this point that it is *not* for this court to choose between two competing schools of thought in educating the hearing-impaired. Philosophical debates concerning the best method of educating the hearing-impaired are best left to educators who consider this problem their metier. "[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States." *Board of Education v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982).

On November 19, 1975, Congress passed the Education of the Handicapped Act. The Senate Report plainly states:

[c]ourt action and State laws throughout the Nation have made clear that the right of education of handicapped children is a present right, one which is to be implemented immediately. The Committee believes that these State laws and court orders must be implemented and that the Congress of the United States has a responsibility to assure equal protection of the laws and thus to take action to assure that handicapped children throughout the United States have available to them appropriate educational services. S.Rep. No. 94–168, 94th Cong., 1st Sess. 17 (1975).

The Supreme Court has said of the EHA:

[t]he Act represents an ambitious federal effort to promote the education of handicapped children, and was passed in response to Congress' perception that a majority of handicapped children in the United States were either totally excluded from schools or were sitting idly in regular classrooms awaiting the time when they were old enough to "drop out." *Board of Education v. Rowley*, 458 U.S. 176, 179 [102 S.Ct. 3034, 3037, 73 L.Ed.2d 690] (1982) (citing H.R.Rep. No. 94–332, 94th Cong., 1st Sess. 2 (1975)).

According to Section 1412(5) of the Act, States must educate handicapped children with children who are not handicapped, however, Congress also "recognized that regular classrooms simply would not be a suitable setting for ... many handicapped children." *Rowley* at 181 n. 4, 102 S.Ct. at 3038 n. 4 (citing 20 U.S.C. Section 1412(5)).

The Act defines a "free appropriate public education" as special education and related services which:

(A) have been provided at public expense, under public supervision and direction, and without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

(D) are provided in conformity with the individualized education program required under section 1414(a)(5) [of this title]. 20 U.S.C. Section 1401(18).

The Supreme Court has interpreted the EHA in the *Rowley* case. *Rowley* addressed the issue of whether the EHA required the State to pay for a sign-language interpreter for a hearing-impaired child in an ordinary classroom. The plaintiff in the *Rowley* case, Amy Rowley, possessed minimal residual hearing but was an excellent lip reader. The Court held that the EHA did not require that a sign-language interpreter be provided for Amy Rowley, mainly because she performed better than the average child and advanced easily from grade to grade. The Supreme Court made it quite clear, however, that "[w]e do *not* attempt today to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." *Rowley* at 202, 102 S.Ct. at 3049 (emphasis added).

 The question before this court is, therefore, how to interpret the Act in order to provide a free appropriate public education for Jennifer and Rene Visco, specifically. Individualization must be the touchstone for the analysis; this value is reflected in the IEP requirement of the Act mandated by Congress.

In interpreting the Act, this court is mindful of the problems encountered by the hearing-impaired in acquiring sufficient language skills to function in society. In fact, this problem has risen to the level of national epidemic, where the President and the United States Congress found it important enough to establish a Commission on Education of the Deaf. The Commission has found, *inter alia,* that "[t]he educational system has not been successful in assisting the majority of students who are deaf to achieve reading skills commensurate with those of their hearing peers." THE COMMISSION OF EDUCATION OF THE DEAF, TOWARD EQUALITY: EDUCATION OF THE DEAF at 17 (1988) (hereafter referred to as Toward Equality or The Report).

In reviewing the Congressional preference for mainstreaming, much debate has ensued over whether the "least restrictive environment" referred to in the Act is synonymous with mainstreaming. Clearly, mainstreaming is a means, not an end. Mainstreaming's function is to prepare a handicapped individual to function as a normal adult in society; it is *not* a goal in and of itself. Nowhere in the Act is a handicapped child required to sink or swim in an ordinary classroom. The Commission on Education of the Deaf provided a wealth of information on the value of a least restrictive environment. The Commission explains:

[t]hat environment [regular school] which may be *least* restrictive in terms of the integration of other handicapped and non-handicapped students becomes the *most* restrictive in terms of basic communication between deaf children and their hearing peers, setting the stage for drastic retardation in development and identity, social skills, and maturity—something clearly unintended by . . . [the EHA]. Worse, severely limiting a deaf child's access to a whole range of experiences with other children and adults may also impede the child's ability to acquire and develop language, a factor which will limit his or her education permanently. . . . Toward Equality at 32–33 (citing Letter from J. Maurer, President, Pennsylvania Society for the Advancement of the Deaf, Inc. to the Department of Health, Education and Welfare (1980)).

The report goes on to say that "[p]lacing a child in the regular classroom without the language needed to function as a participant seriously impedes, if not precludes, the child from receiving any worthwhile education in the class." Report at 33. Congress certainly did not intend to place

handicapped children in a least restrictive environment and thereby deny them an appropriate education.

The Department of Education has stated as a matter of policy that there is a special role for schools such as DePaul. The Department's Assistant Secretary has said "in some cases, separate environments have been recognized as the least restrictive for some individual children." Report at 26 (footnote omitted). Therefore, a school like DePaul could be least restrictive for some children. Furthermore, the regulations for the EHA plainly state "[i]n selecting the least restrictive environment, consideration is given to any potential harmful effect on the child or on the quality of services he or she needs." 34 C.F.R. Section 300.552(d) (1987). (A thorough search of authorities reveals this regulation has not been previously cited by a federal court as of the date of this opinion.) A fair reading of this regulation makes the least restrictive environment a function of potential harmful effect and the quality of services. Therefore, in determining a "free appropriate education" under the Act, it is necessary to consider the individual requirements of the child or children in question along with the potential harm a program may present. It follows that the decision of whether or not to move a child from one program to another is arrived at by balancing the possible benefits against the potential harm for the particular child in question.

The EHA, along with the accompanying regulations and the policies behind the Act must be applied to the facts of this case. Jennifer has attended DePaul Institute since age 3½ years and Rene since the age of 1½ years, and both children have progressed from grade to grade easily. DePaul employs the oral-aural method of educating the hearing impaired, whereas the Liberty and Beechwood Schools employ the total communication method. A change in schools for either Rene or Jennifer would, therefore, mean a change in the educational method used to teach them. It would also have meant a change in the educational method at the time this complaint was filed. Once a student is making good progress in a particular program, a change

must be viewed with a great degree of caution. In balancing the potential benefits against the potential harms, even if the benefits and the harms were to weigh equally, the child in question should not be moved from one program to another.

Judge Dumbauld recognized the wisdom of this cautious approach to changing a deaf student's educational program where the change would entail a new method of educating the hearing impaired *Grkman v. Scanlon*, 528 F.Supp. 1032 (W.D. Pa.1981). In that respect, Judge Dumbauld faced the same issue that is before this court in the instant case. The *Grkman* case involved an eight-year old deaf girl, Lindy, enrolled at DePaul since she was 1½ years old. The School Board sought to remove Lindy from DePaul and place her in a program for the hearing-impaired at an ordinary elementary school. The court wisely decided it was best to keep Lindy at DePaul and offered two persuasive rationale which are applicable in the instant action. First, "[a] sound maxim in sports is 'always change a losing game—never change a winning game' ... At present, Lindy is making satisfactory progress in her present educational environment. It is important to maintain 'momentum.' The risks of change outweigh the possible benefits." *Grkman* at 1037. Second, in regard to the need for Lindy to concentrate on acquiring fundamental language skills before placing her in an ordinary elementary school with a program for the hearing-impaired, "[c]hampionship prowess will sooner be attained if she [Lindy] concentrates on intensive training and learning to swim before she plunges unprepared into the turbulent mainstream." *Grkman* at 1037. The choice before this court concerning Jennifer and Rene is essentially the same.

Mastery of language skills is vital to an adult in our society. The program at DePaul allows a hearing-impaired youngster to enter the tenth grade as any other pupil. It makes no sense to move Jennifer and Rene, risking loss of fundamental language skills which will prepare them for 10th grade, with the only possible benefit being several years of "mainstreaming"; the ben-

efits of which the Commission on Deaf Education has placed in serious doubt. Mainstreaming that interferes with the acquisition of fundamental language skills is foolishness mistaken for wisdom. This court firmly believes it is far better to prepare the handicapped to function in society as ordinary adults via special schools such as DePaul, rather than mainstreaming a youngster now with the possibility of producing an adult who might have to rely on social services later because he or she cannot communicate effectively. Nescient educational mainstreaming defeats the very purpose for which mainstreaming was conceived. The ultimate goal is to adequately prepare individuals for the mainstream of life.

The instant case poses a particularly compelling illustration of this because Jennifer has only 2 years to go at DePaul and Rene has 4; after which, both Jennifer and Rene will be able to enter high school as any other 10th grader. To interrupt their studies with a different method of teaching in order to "mainstream" Jennifer and Rene for such a short period of time is definitely not worth risking the acqustion of language skills both children need to function as high school students as well as adults in society.

The Commission on educating the deaf reveals not only to the President and Congress, but to the world, that there are a sufficient number of deaf children and deaf families who are not being properly brought into the mainstream of life, culture and social participation and that there are ways in which this can be done. The Commission asserts that there need be no elimination or plucking out from our scheme of life, certain ones because they are deaf. Life for these who are handicapped should be and can be no different than those of hearing individuals, provided they receive a proper educational foundation. On the day of the hearing, I saw a 13–year old girl and an 11–year old boy as two human beings, indistinguishable from other children of their ages. I can see no reason why these two children cannot achieve everything and anything a hearing child can achieve. It may mean that they need the help of such modern aids as electronic amplification and specialized skills, but intelligence, cognition, ambition and determination are the great equalizers of our day. This is no longer an age where a deaf or handicapped person is to be looked upon as inferior to one who is not deaf or handicapped. Education is the cornerstone of these achievements and contributions. Jennifer and Rene Visco may remain at the DePaul Institute in order to prepare them for admission to the public schools when they graduate from DePaul Institute.

In the course of human natural events, it is unusual that a family be of such a constitution as to have the mother and the children deprived of the power of hearing and we can only imagine how that family manages to live their lives in a style that is so different from most other human beings. We must in viewing this situation express admiration for a mother of such a family of children and for the magnificent way in which she reared them and showed them to the world through this court at the time of the hearing. She may, indeed, be proud of her two children for whom she has brought this action and has acted in their behalf so that they might become citizens of America equal with all other citizens of this wonderful country. This statement is not made for the purpose of being partial, but for revealing a set of circumstances which is the result of maternal caring and doing on the part of this plaintiff and which factually should be expressed.

As I have stated previously, the decision in this case should have been made long before now. To a certain extent, as I have already stated, this court must accept a certain amount of the fault, but the primary fault of not pursuing this case and not resolving this case lies with the lawyers. It is often too difficult for courts to keep spurring counsel into action as was finally required in this case. As already explained, the children's problem was much too serious for the lawyers to ignore, even as it was too serious for the courts not to be made aware of the fact that it was being ignored. No harm has resulted since the bringing of the action and now because of

the excellent application of education that DePaul has given these children in such an exceptional set of circumstances of a deaf family. For that reason, the court may judge counsel less harshly that they deserve, mainly for the reason that such attorney conduct should not recur in cases such as this. This is the only admonishment I shall heap upon counsel because no real harm was done and I shall overlook the carelessness and disregard of plaintiff counsel of both his client and the court instead of imposing sanctions as ordinarily would be done. The matter will be dealt with in accordance with a proper order of court.

## ORDER

AND NOW, TO-WIT, this 28th day of April, 1988, the petition of the plaintiff is hereby granted and it is hereby ordered and directed:

that the plaintiff children, Jennifer and Rene, shall continue to remain as students at DePaul Institute until their graduations;

that additionally, the defendants, School District of Pittsburgh, Pittsburgh Intermediate Unit # 2, William W. Penn, Director of Division for Exceptional Children of the School District of Pittsburgh and Director of Pittsburgh Intermediate Unit # 2, Department of Education of the Commonwealth of Pennsylvania, and Robert C. Wilburn, Secretary of the Department of Education are hereby restrained from interfering with the attendance of school of Jennifer and Rene at DePaul Institute until their graduations;

that the defendants shall continue to fund the education of Jennifer and Rene at DePaul Institute until their graduations; and

that attorney's fees are hereby denied except for such amounts as DePaul's Parent Action Group has paid to Ralph J. Sanders as counsel fees and that such sums shall be repaid by the defendants to the DePaul's Parent Action Group, and all costs shall be borne by the defendants, School District of Pittsburgh and Department of Education of the Commonwealth of Pennsylvania.